PEOPLE *v*. WINNEY.

1. CRIMINAL LAW — MURDER—EVIDENCE—ADMISSIBILITY—REMOTE-
NESS—CORROBORATING TESTIMONY.

In a criminal prosecution for murder, evidence of a witness
that two months after the murder he discovered tracks in
some of the victim's blood remaining on the floor of the
room where she was killed, which he identified as those
of the accused, was properly admitted as not too remote,
where there was other evidence as to the existence of such
marks two or three days after discovery of the body, and
the premises had not been disturbed from the time of dis-
covery of the body up to time of the discovery of the
marks by such witness.

2. SAME.

The testimony of a witness that he found a paper with
blood stains upon it at the house where the offense was
committed, two days after discovery of the body, was
properly admitted, and its weight was for the jury.

3. SAME.

Evidence that defendant committed a burglary and stole
some revolvers and ammunition the night prior to the
murder, was properly admitted solely as bearing on the
question whether defendant possessed the means for com-
mitting the murder.

4. SAME—WITNESSES—CROSS-EXAMINATION—DISCRETION OF COURT.

On cross-examination of a witness in a criminal case con-
siderable latitude of discretion is allowed in permitting
questions calculated to elicit information as to the past
life and conduct of the witness.

5. SAME — EVIDENCE — ADMISSIBILITY — RELEVANCY — APPEAL AND
ERROR.

The admission of certain letters and a photograph of de-
fendant, in a prosecution for murder, on his cross-
examination, to show his lack of veracity as a witness
and his character, while not relevant, was not reversible
error.

6. SAME—MURDER—SCENE OF CRIME—VIEW BY JURY—DISCRETION OF COURT.

The matter of the view by the jury, of the place where an alleged crime has been committed, lies within the discretion of the court.[1]

7. SAME.

The purpose of the view by the jury is to enable jurors to comprehend more clearly by the aid of visible objects the evidence already received, and not to secure new evidence.

8. SAME.

It is improper to permit a witness to testify as to the location of objects, or as to any other material point, in the presence of the jury while they were viewing the place where an alleged crime has been committed.

9. SAME.

The jury viewing the place where the crime had been committed, had the right to consider all they saw in the room having reference to tracks, imprints or marks testified to and mentioned by the witnesses in a general way.

Error to Jackson; Parkinson, J. Submitted April 13, 1917. (Docket No. 162.) Decided May 31, 1917.

Harold Winney was convicted of murder in the first degree, and sentenced to imprisonment for life in the State prison at Jackson. Affirmed.

*John F. Henigan,* for appellant.

*Nathan E. Bailey,* Prosecuting Attorney, and *M. Grove Hatch,* Assistant Prosecuting Attorney, for the people.

STONE, J. The defendant was charged with the murder of Caroline Sryrock, a woman upwards of 70 years of age, in her house in the township of Spring Arbor, Jackson county, on the 26th day of February, 1914, by shooting with a 32-caliber revolver. It was

---

[1]On discretion of the court as to right to view of jury in criminal case, see note in 42 L. R. A. 372.

not disputed that Mrs. Sryrock was murdered and under circumstances that made the crime murder of the first degree, but defendant denied all connection with the murder.

Mrs. Sryrock lived alone in her home and was last seen alive on Thursday, February 26, 1914, between 5 and 6 o'clock p. m. It was claimed on behalf of the people that defendant did the act with a revolver with which he had previously supplied himself for that purpose. As tending to show that defendant had the means of doing this act, evidence was received tending to show that he committed a burglary in the hardware store of Finch, Rowley & Bower at the city of Jackson on the night before the murder; and it appeared by defendant's testimony, on his direct examination, that on the night before the murder was committed he burglarized said hardware store in the city of Jackson and there obtained two revolvers of 32-caliber and a rifle, and some ammunition, and the guns were produced at the trial, and defendant testified: "I should say the guns here as exhibits are the same ones I stole." It was claimed upon the trial that defendant, and probably some one co-operating with him, took possession of a horse and cutter standing on the street in the city of Jackson on the evening of Thursday, February 26, 1914, and made use of this horse and cutter as a means of transporting himself to the home of Mrs. Sryrock, in the township of Spring Arbor, about 10 miles from the city of Jackson, early in the evening of that date, and then and there with the use of one of said revolvers shot her to death. Defendant at the time was stopping temporarily at a hotel in the city of Jackson. He was acquainted with Mrs. Sryrock, having recently lived with his grandmother, who resided a short distance from Mrs. Sryrock's home. He testified, on his direct examination, that six weeks or two months before his arrest he had been at Mrs.

Sryrock's home and there stole $10 from her, and it was the claim of the people on the trial that the motive which inspired this murder was that of obtaining money. The evidence produced by the people was largely circumstantial, together with certain claimed admissions and statements in the nature of confessions. made by the defendant. The defense was an alibi and a complete denial by the defendant that he committed the crime. The defendant was convicted of murder of the first degree, and was sentenced for life, and is now undergoing such sentence in the State prison at Jackson. The case has been brought here by the defendant upon writ of error, and, while there are many assignments of error, we shall consider only those which are argued in defendant's brief; the case having been submitted to this court upon briefs.

It ought to be here stated that the homicide was not discovered until the evening of the 27th day of February, 1914. The house was then visited by Dr. Marks, coroner of the county, and a deputy sheriff. Dr. Marks was unable to state how long Mrs. Sryrock had been dead, but he testified that she had received numerous gunshot wounds in the head, any one of which, in his opinion, was sufficient to have caused instant death. He testified that the body was cold, that *rigor mortis* had either set in and passed away, or else it had not set in; that it was impossible for him to say which; that *rigor mortis* may last from 10 or 12 hours to 24 hours. She was found in the kitchen where she had lived, and there was a little fire remaining in the coal stove which was used for heating the room.

The defendant was arrested on the afternoon of Saturday, February 28th, being the last day of February that year. He is a young man who for a number of years had been totally deaf, and had a crippled or short leg, and wore what is termed a stirrup, the

bottom of which was of iron, to overcome the shortness of that leg.

The 1st assignment of error is to the effect that the court erred in refusing to grant a motion of defendant's counsel to have stricken from the record the testimony of the witness Holland, a deputy sheriff, in regard to tracks in the blood which he claimed to have discovered on the 23d of April, because the evidence at that time showed that the tracks were not discovered by him until the 23d of April, and it was claimed that the murder took place February 26, 1914, to which ruling counsel for the defendant duly excepted. The testimony of the witness Holland was to the effect that he visited the premises on the evening of February 27, 1914, being Friday night, between 8 and 9 o'clock. It is true that this officer did not at that time discover any tracks, or anything claiming to be tracks, in the blood upon the floor in the room where the woman was found killed. At that time her body was found on the bed, and her limbs were off the bed and her feet down on the floor, and the condition of the room was what is described as "in a torn up condition." The bureau drawers had been pulled out, and it looked as though the contents had been scattered about the floor. This witness described very fully the condition of the blood on the floor, and the fact that he picked up two bullets in the blood. They were bullets of 32-caliber size. The following day he visited the house again and found another bullet in the blood, or close to it, of the same caliber as the first two. This witness described the conditions, stating that it looked as though the body had been dragged on the floor and thrown upon the bed, and an apron had been wound around the head of the deceased. Upon the trial, this witness further testified as follows:

"I was out there on the 23d of April, and at that

time I observed what looked to me like a track in the dry blood. It appeared to me as though it was made by an iron stirrup worn on the bottom of the shoe of a man that was crippled in one limb to overcome the shortness. Appeared to me there was nothing touched in the center of the track, but there was a rim right around the outside about half an inch wide. I think I went out there again on the 27th with Sheriff Strobel, Arthur Havens, Fidus Livermore, and William Horsman, and yourself, and I observed this track at that time. There was another place that looked as though it might be a track, but it wasn't as plain. When I was out there with you and the sheriff and Mr. Livermore, we had this iron shoe belonging to the respondent, and it was tried in there to see if it fitted that track that was in the blood we saw there, and it did. I don't know that I ever had any talk with respondent about this matter. * * * I was there when the comparison of this toe with that footprint out there was made. If you stand off towards the southeast corner of the room, perhaps five, six, or seven feet, you can see that footprint very plainly in the dry blood. You have to bend over to look at it in a diagonal way. * * * There were a good many marks around on the floor there. There was what indicated a heel print and that has been affected by the rats. It was less distinct. * * * The track is obliterated slightly now from what it was when I was out there first and saw it. It has been—what I would say the work of rats, been gnawing more or less so it isn't as plain as it was when I first saw it."

The testimony of the witness Holland came in at first without any objection. At the close of the re-cross-examination of the witness, defendant's counsel moved to have stricken from the record the testimony of this witness in regard to these tracks in this blood which he claimed to have discovered on the 23d of April, on the ground that it was too remote, and that the evidence showed no such tracks were discovered by him at the time of the first visit. The prosecuting attorney then announced he would produce the testimony of four witnesses to show the tracks were seen

soon after the body was discovered. The court said upon this announcement by the prosecuting attorney:

"If at the close of the testimony you call my attention to that, or in connection with the charge, I will try to give proper instructions in regard.to it, or possibly strike it out. I don't know, but at the present time I don't think I ought to grant your motion, especially as the prosecutor says he will produce evidence that that track referred to by this witness Mr. Holland was there and noticed immediately after the discovery of the crime."

An exception was taken to this ruling, but the matter was not again called to the attention of the court during the trial.

As showing the condition of the record upon this subject of the tracks, the witness Welch, a deputy sheriff, testified as follows:

"I first saw the imprint of the shoe in the blood on Sunday, March 1st. It was an accident I saw it, because you have to stand back in kind of a diagonal position to see the imprint, but after you see it once you can readily distinguish it then. But unless you was standing out here, in a glance you couldn't—you wouldn't pay any attention to it, but as you stand off you can see where the shoe has pressed it into the blood, and it looks lower than any other part of the blood. The rest of it is up around it, right in between where the shoe was hollow. I also saw a mark in the blood there, I imagine about six inches or seven inches from where I picked up this paper with the blood on it, with the imprint of a shoe, with the heel of a shoe. It has got kind of a—made like iron of some kind. An ordinary shoe, I don't think, would do it. I tried with my foot to see if I could make an imprint, and I couldn't make any impression at all on it. March 6th was the next time I was out there. I was out there some time later than March 6th, too. I went out there to look over the house to see that everything was all right, so as to see how conditions was, and I examined the track then and found it just the same way it was

when I first saw it. I covered it up with pails because I noticed on the north end of the blood, where the blood starts to run, from the northwest corner point of the blood, the rats had commenced to eat it, and I covered it up to protect it so nothing would get to it. I imagine the blood on the floor would be about 2½ feet, starting in kind of a diagonal point and running from the corner of this which stands in the northwest corner of the room, runs in a diagonal shape towards the southeast—towards the stove. As it goes from the north, the floor looks as if it sagged and more of the blood had gone to the southeast part of the blood. The size of the space covered was about 2½ feet long and about a foot or 1½ feet wide. I don't know it is quite that wide. I didn't just measure it, but that was my observation of it. There was quite a crust on the blood when I first saw it. The last time I was there, the rats had gone to eating it, and eat quite a lot of it off the floor. I picked up a piece of paper there, and that is the paper, and it is in the same condition now it was, folded up just the same way it was. Never was disturbed. The writing was put on by the sheriff, so as to prove the day we got it and where it came from. When I came right back, I turned it over to the sheriff and he wrote on it. The date ought to have been put on. I don't know whether he put it on or not. I know I brought it home on Sunday, March 1st. * * * The heel mark was made on this piece of paper, and the toe mark was made in the pool of blood. The mark of the toe was made in the south end of the pool of blood near the stove; that is where it was thicker, and that was about, I should imagine, maybe 8 or 10 inches from the stove where it stopped to run. The piece of paper was directly in front of the stove, which would be about 2½ feet probably from the nearest point of the blood to where I found that paper. We discovered some marks on the floor; myself, personally, I wouldn't want to claim they were put on by the heel, but later on, if the jury goes out to decide for themselves, not for me. I discovered two more marks on the floor there. Two more marks on the floor beside that one. I found that on the paper—that was found nearer where most of those other marks was on the floor."

Lena Reed testified as follows:

"The second day after the murder, I was on the outside, and about a week later I was on the inside of the house. I think it was just a week from the day of the murder I was inside, but I don't know the date exactly. Mr. Curtis, Mr. Welch, and St. Clair Pardee were there at that time. I noticed a pool of blood there, and I noticed a heel print in the blood. It was near the edge of the pool on the east side. It looked as though it had been stepped in as they were going out. The foot was facing east. It was just a common heel print, as far as that was concerned, when the shoe was facing east. I didn't see more than one track, and Mr. Curtis called my attention to it. It looked like an ordinary heel track with the toe pointing east. That was the only track I seen. * * * Mr. Welch was in the room with us when Mr. Curtis called my attention to the heel track. I don't remember that Mr. Welch called my attention to what appeared to be a track made by the toe of that iron shoe, or by an iron shoe like that. I didn't pay much attention to the heel track. * * * It was the heel print in the edge of the blood he wanted me to take a picture of. I developed the picture I took, and after it was printed sent them a copy. I don't know how much space the blood covered. It ran lengthwise north and south, and was longer that way than it was across it east and west. * * * It appeared to me as if some one had stepped there, just the heel of the shoe had struck the blood and the rest of the foot escaped striking the blood. I didn't pay much attention to the track and couldn't tell much about it."

The witness Livermore stated:

"I noticed when I was out there what appeared to be a footprint. It has the indication of a horseshoe, or a small horseshoe. I saw the sheriff compare the iron shoe with it, and it seemed to fit. It was the heel part I saw."

The witness Emma Pardee testified as follows:

"About a week after they found her, I was up there the same time Mr. Welch and Mr. Curtis were there, and it was the same day Miss Reed was there, but she wasn't there when I was, and I noticed an outline

of a foot in the blood, but I couldn't tell from its appearance what it was made by. It looked like the outline shape of a foot, but the blood was higher in the center than it was at the heel, so it wasn't an ordinary foot—I mean in the center of the outline. I saw the same imprint the next Tuesday or Wednesday, when I was there again with my son. My son called my attention to it. * * * My son called my attention to this imprint I saw on Friday. Mr. Welch was there at the time, and Mr. Curtis was with him."

The witness Brighton also testified:

"I went with Welch out to the Sryrock home and saw an imprint in the blood. Welch and I went out there, I think it was on Sunday or Monday (March 1st or 2d). I wouldn't say for sure, either one day or the other, and, when we went out there, we were looking for imprint or any marks or any tracks to identify who was the party or—if we could find out who was there, and in the southeast corner of the blood I should say about two feet from the stove, only a few inches from the edge of the blood, we found an imprint in the blood that showed a heel. Further investigation, we found the toe of the thing there. The toe in the imprint, something similar to that we had examined. I had never seen Mr. Winney's shoe up until this, never taken any notice of it; but the inside was hollow, just the same as a shoe worn by Mr. Winney."

This is substantially all the testimony upon the subject of the tracks on the premises which had been found prior to Holland's discovery.

In view of the fact that other witnesses testified to the existence of these marks within two or three days after the body was discovered, and while the condition of the premises remained substantially the same as when the body was found, as, we think, the record shows, and it appearing that the condition of the premises had not changed down to the time when the witness Holland testified to seeing the marks on April 23, 1914, we do not think it was error for the court to

refuse to strike out the testimony of Mr. Holland under the announcement made by the prosecuting attorney, which announcement seems to have been substantially made good by the testimony.

In the case of *People* v. *McCurdy,* 68 Cal. 576 (10 Pac. 207), evidence of the measurement of certain footprints found in the vicinity of the place of the homicide, and corresponding with the footprints of the defendant, was admitted. The measurements were made, respectively, about five days and two weeks after the date of the homicide. The court held that the evidence was admissible, and that its weight was for the jury, saying:

"Had the measurements of the footprints been made at an earlier day, the value of the information acquired as evidence would, no doubt, have been greater; but it does not follow that the testimony was incompetent."

We think the weight of this evidence was for the jury to consider, and that it was not error to refuse to strike it out. As has already been remarked, the court's attention does not seem to have been called to this subject again by counsel for the defendant.

The 23d assignment of error is to the effect that the court erred in receiving in evidence the piece of paper which the witness Welch testified he had found on the floor of the Sryrock home on Sunday, March 1st. Objection was made to this offer, and an exception duly taken. This was a piece of paper found at the place of the homicide with certain blood stains upon it on Sunday, March 1st; the body having been discovered on Friday evening.

We think this ruling was not error, and the weight of the evidence was for the jury. The paper seems to have been fully identified, and was found at the place of the homicide. The 24th, 25th, and 26th assignments of error relate to the instructions given to the jury by

the court at the time they were about to leave the court-room to be taken to the premises for the purpose of taking a view of the interior of the house where the homicide was committed, its location, and surroundings.

The 24th assignment of error is because the court used the expression:

"What you see there becomes a part of the evidence in the case as I understand it."

The language excepted to in the 25th assignment of error is the following:

"It is simply for the purpose of enabling you to see what can be observed by the human eye that you are taken out there, and it is simply what you can see that you can treat as evidence in the case and act upon it."

In the 26th assignment of error the following language is excepted to:

"But if you think you see something that is perhaps overlooked by the others, in my judgment you would have a right simply to call the attention of your fellows to it so as to be sure you all see the same thing. I say that so when you come to consider this case, if in your deliberations anything comes up about what was seen out there, you may avoid any difficulty or embarrassment because one juror is claiming to have seen something that the rest of them did not see."

Error is assigned upon but a small part of what the court said on that occasion. The court used the following language:

"What you see there becomes a part of the evidence in the case, as I understand it. It is simply for the purpose of enabling you to see what can be observed by the human eye that you are taken out there, and it is simply what you can see that you may treat as evidence in the case and act upon it. That excludes any statements which may be made in your presence, and, so far as anything concerning this case or act is concerned, there should be no statements made in your

presence and hearing while you are gone.  Persons
will not be permitted to point out anything to you,
particularly if the pointing out of anything requires
them to say anything.  The prosecutor and Mr. Kirk-
by, as attorney for the respondent, will be there, and
the respondent himself will be there.  If there is any
particular thing which you do not discover yourselves,
I shall permit the prosecutor or Mr. Kirkby to simply
point to the thing, and you can do the looking for
yourselves.  They do not have to tell you anything
about it.  You should not converse with anybody in
regard to this case or any element in this case while
you are gone.  *  *  *

"Now then, gentlemen, you are not permitted to
make any experiments when you go there, or to per-
mit anybody else to make any experiments.  You must
observe what is observable and fix it in your mind as
well as you can, and then, as further testimony comes
in, use it in connection with what you see, as well as
the testimony already taken should be used in refer-
ence to what you can see there.

"The less talk there is on the part of anybody, the
better.  I do not think you ought to talk about it be-
tween yourselves and among yourselves further than
I think it would be permissible if there is anything any
one of you notices which you think is of any im-
portance that you may point out to the others, but
do not discuss it, nor say what you think about it, or
whether you think it is significant or whether you do
not.  But if you think you see something that is per-
haps overlooked by the others, in my judgment you
would have a right simply to call the attention of your
fellows to it so as to be sure you all see the same thing.
I say that so when you come to consider this case, if
in your deliberations anything comes up about what
was seen out there, you may avoid any difficulty or em-
barrassment because one juror is claiming to see
something that the rest of them did not see.  *  *  *

"Mr. Kirkby makes the suggestion to me, which I
think is right and I ought to say something about it.
You are taking this view nearly three months after
this affair occurred, and you can only see what you
can see now after the lapse of this period, and the real
thing is to know what was the situation at the time, so

you must take this view and the testimony to aid you in determining how things were at the time. What you see now may be—may have been modified somewhat by the lapse of time and possibly interference, but so far as we can find out there has been no interference. That, gentlemen, is one of the dangers of taking a view a long time; the danger that because of changes, the view may be misleading. You have to use your own sense and judgment in this direction and try not to get any perverted view traceable to changes that may have occurred.

"*Mr. Kirkby:* I wish the record to show that I take an exception to the instructions of the court. My understanding of the law is that in taking a view it is for the jury to apply what they see to the evidence as given by the witnesses from the stand to enable them more clearly possibly to understand the evidence.

"*The Court:* That is what I mean to say.

"*Mr. Kirkby:* A view itself is not evidence in the case, especially when taken at such a late date after the commission of the alleged offense. It is simply to aid the jury in applying what they see to the testimony as given by the witnesses; to better—to give them a better understanding of it, but it isn't evidence. Evidence is what is given here in court from the stand and by the witnesses. Another thing the court has not mentioned. The court has said they need try no experiments. I see the authorities lay it down as a proposition they should take no measurements or anything of that kind.

"*The Court:* That is, distances or anything of that kind. That is true. It is unimportant, gentlemen, whether you consider what you see as a part of the evidence in the case, or whether you do not, because having learned what you will learn by observation you are expected as men of sense and judgment to use that knowledge in a legitimate and proper way, and a view is proper to aid you in the discharge of your duties as jurors. * * * Mr. Kirkby, if there is anything else in order to guard your client, you think I ought to say, I will say it—anything that occurs to you?

"*Mr. Kirkby:* No, I am content with the exception I took to the statement of the court."

The 29th assignment of error is to the effect that the

court erred in using the following language, already quoted:

"What you see now may be—may have been modified somewhat by the lapse of time and possibly interference, but so far as we can find out there has been no interference."

In its charge to the jury, the trial court, referring to the defendant's testimony relating to the burglary, said:

"So far as any statements he made relating to the burglary, they should not be considered as admissions of the crime in question."

This is the basis of the 47th assignment of error.

The 48th assignment of error is based on the following portion of the charge:

"Now there are some special features of this case that I think I ought to say something about, and the first that occurs to me is this matter of breaking and entering of that hardware store on the night of February 25th and committing larceny therein. The time this evidence was first offered on behalf of the people, I admitted it to enable you to pass upon the question as to whether the pistols in evidence were in the possession of the defendant before the murder and whether one of them was used to kill Mrs. Sryrock."

The following is the basis of the 49th assignment of error:

"And the people claim that this offense, the breaking and entering and larceny of the firearms in the store, was in contemplation of the act of the next night, February 26th, and a preparation for it by, in this way, procuring the means."

The court also added the following:

"The general rule, gentlemen, would exclude all evidence of separate and distinct offenses, especially where they have occurred previous to the crime charged for which the accused may be upon trial. And this evidence cannot for one moment be used by you

to his prejudice because of the commission of any other distinct and separate offense.

"This evidence was not for the purpose of showing the respondent was a bad man or a bad character, or to allow it to be used to show that he was a man likely to commit the offense charged. It isn't the question whether he is bad enough to do it, but did he do it? That is the question. (You are to avoid allowing any force to this piece of evidence as any evidence that respondent committed the murder charged. It should be used only for the legitimate purpose of showing he had means to commit the crime of murder, but not as evidence that he did murder. If he did, that fact should be proven by other evidence.)"

The 50th assignment of error is based upon this last language contained in parentheses.

The 51st assignment of error is based upon the following:

"If you believe him guilty under the evidence in this case, you may consider the means he had, and how, when, and where, and what for they were obtained, if the evidence shows what for they were obtained."

The court also added:

"But do not convict him of this crime charged on general principles, because he may have committed other crimes and have been a bad young man as claimed."

Also, the following:

"But after the evidence was admitted, when the defendant took up his own case he became a witness on the stand in his own behalf, and in giving testimony in his own behalf he admitted he committed the offense of breaking and entering the store in question in the nighttime and committing therein the larceny of firearms and ammunition."

The 55th assignment of error is based upon the following portion of the charge:

"Now, there has been introduced in evidence a photograph, and there have also been introduced certain letters which this respondent wrote to a lady.

These came in upon his cross-examination, and they were submitted to you, and you have the right to consider them in connection with the solution of the question as to the degree of credit you should give to his testimony. In other words, it was permitted in order that you could ascertain the kind so far as the kind of man he was, or is, would aid you in determining to what extent you ought to believe him, if at all. The fact he got his picture taken with an old plug hat smashed down or holding a pistol is not of any special significance and would not have been submitted except it was part of one of these letters, mentioned in the letter and went with it. But so far as it aids you in determining the kind of man he is as a witness, whether he is the kind of man as a witness you ought to believe, I admitted that testimony."

The 56th assignment of error is based upon certain instructions that were given by the court to the jury when they came in for further instructions while considering their verdict. The jury, after being absent for a time, returned into court, where the following proceedings were had:

· *"The Court:* Is it correct that you wanted to ask me some question?

*"A Juror:* Yes, sir.

*"The Court:* What is it?

*"A Juror:* The question arises as to whether we can use evidence we saw out at the scene of the murder in our deliberations, or anything that hasn't been sworn to, anything we saw there that hasn't been sworn to; whether we can use it in our deliberations or not?

*"The Court:* Gentlemen, I think I explained it distinctly before you left for the place of this tragedy. I told you then, and I didn't think it necessary to repeat it in my charge, that you went out there to take a view, and that what you saw would be a part of what you would use in your deliberations and in considering the case. Mr. Kirkby objected that it wasn't evidence of— Mr. Kirkby, I didn't understand your position in that regard. Judge Peck used to always instruct the jury the view was a piece of evidence. Just what is your contention in that regard?

"*Mr. Kirkby:* It is, in a sense, your honor, not in the full, complete sense. They take the view in connection with the sworn testimony in the case to get at the truth of the matter.

"*The Court:* That's all right. You use it in connection with the sworn testimony. If the testimony said there were things there and the situation was so and so, you use what you saw in connection with it. How true and how accurate the testimony is, or how it lacks in truth or accuracy.

"*A Juror:* To make it plainer, your honor, we will suppose there was another track discovered there that hadn't been sworn to in the evidence that would correspond with the track that had been sworn to. Could that be used—

"*The Court* (interrupting): I don't know how it could be helped. That is what you went there for—was to get information and light. If I hadn't supposed it would furnish you any information or light, I should not have spent the time in taking you up there.

"*Mr. Kirkby:* I think, your honor, the jury should be instructed that occurred on last Friday, and they should take into consideration the remoteness of the time and the condition of the premises.

"*The Court:* Of course, Mr. Kirkby, that was two months ago or more. The jury as intelligent men must take all those things into consideration and give to what you saw no more weight than what you think it is entitled to. It was supposed at the time you went, it was to enable you to get a clearer notion of this matter the witnesses had told about or described.

"*Prosecuting Attorney:* There was more than one track sworn to, but the other wasn't as distinct as this particular one.

"*The Court:* Whether more than one track was sworn to or not I do not undertake to say.

"*Prosecuting Attorney:* There was testimony to that, but it wasn't as distinct as the one the most evidence was given about.

"*The Court:* You were sent there to make the testimony clearer and to get the aid of your observations, and I cannot say you should be deprived of that. Is that all?

"*A Juror:* That's all."

The jury thereupon retired and later returned a verdict of guilty of murder of the first degree.

The assignments of error based on that part of the charge relating to the use that could be made of the evidence of the burglary, and the possession of the revolvers, and of the finding of a revolver in the jail after defendant's arrest, and what defendant testified to in that connection, are all in our opinion without merit. All of this evidence bore upon the question whether or not defendant had possession of the means to enable him to commit the crime of murder. In our opinion, this part of the charge was well guarded. In fact, the court might well have gone further, and might have said that the jury might consider the means defendant had, and how, when, and where, and for what purpose they were obtained, in determining whether he was guity of the murder charged. *People* v. *Wilson,* 55 Mich. 506, 514 (21 N. W. 905).

The 55th assignment of error is to that part of the charge relating to the introduction in evidence of a photograph of defendant, and some letters written to a young woman, which matters were brought out in the cross-examination of the defendant. The defendant admitted that these letters were false in their statements. They were not relevant to the case, and might well have been excluded. They seem to have been admitted for the purpose of showing the untruthfulness of the defendant as a witness, and "the manner of man he was." We have often said that on cross-examination the court must be allowed considerable latitude of discretion in permitting questions calculated to elicit any information as to the past life and conduct of a witness. *Beebe* v. *Knapp,* 28 Mich. 53, 72; *Jacobs* v. *Insurance Co.,* 195 Mich. 18 (161 N. W. 936) ; *People* v. *Kimbrough,* 193 Mich. 330 (159 N. W. 533). We do not think that the reception of this evidence, or the allusion to it in the charge, was reversible error.

This brings us to the most important question in the case in our opinion; that is, the instruction of the court with reference to the duty of the jury in connection with the view of the premises, taking into consideration all that the court said before and after the view. In *People* v. *Auerbach*, 176 Mich. 23, at page 46 (141 N. W. 869, 877, Am. & Eng. Ann. Cas. 1915B, 557), we said that:

Our statute "provides that the court may order a view by any jury impaneled to try a criminal case whenever such court shall deem such view necessary. The matter of the view of the place where an alleged crime has been committed seems to be discretionary with the court. The question whether the purpose of the view is to furnish new evidence, or to enable the jurors to comprehend more clearly by the aid of visible objects the evidence already received, is one upon which the courts seem to be divided; the better doctrine being the latter of the above propositions. It certainly would be improper to permit a witness to testify as to the location of objects, or as to any other material point in the presence of the jury while taking the view."

We adhere to the rule stated in that case. Many cases will be found upon the subject in the note to *People* v. *Thorn*, 156 N. Y. 286 (50 N. E. 947), as reported in 42 L. R. A. 368.

In the instant case, while there were some isolated expressions used by the trial court with which we cannot agree, yet we cannot say, taking all that was said by the court, as well as by court and counsel in their colloquy, that the jury was misdirected. There is no claim of any misconduct on the part of the jury. It will be borne in mind that there was not only testimony of a track, but of certain other imprints or marks in the blood on the floor of the room where the homicide was doubtless committed. Manifestly, the jury had the right to consider all they saw in the room, having reference to tracks, imprints, or

marks testified to, and mentioned by the witnesses in a general way. If what the witnesses called marks in the blood the jury thought to be tracks, can it be said they should not use their senses in the matter? Would it, after all, be anything more than the weighing of the evidence, "to enable the jurors to comprehend more clearly by the aid of visible objects the evidence already received?" It would seem not. In the colloquy between the juror and the court, it is not clear that the juror was not referring to the same things testified to by the witnesses as "another mark," or "other marks." The last question asked by the juror presents a mere suppositious case? "Suppose there was another track discovered?" At the most, the juror was referring to a track or tracks in the blood on the floor about which testimony had been given. We doubt if it can be said that there is anything to indicate that the jury was considering, or contemplated considering, new evidence, or anything that had not already been testified to.

After mature consideration of this subject we cannot say that there was reversible error in the instructions. In our opinion none of the errors complained of call for a reversal of the case, which seems to have been tried with care, nor can we say that the verdict and judgment constitute a miscarriage of justice.

The judgment of the circuit court is therefore affirmed.

OSTRANDER, BIRD, and STEERE, JJ., concurred with STONE, J. KUHN. C. J., and MOORE and BROOKE, JJ., concurred in the result. FELLOWS, J., did not sit.