PEOPLE *v.* GREESON.

1. HOMICIDE—CRIMINAL LAW—ALIBI — EVIDENCE — SUFFICIENCY — QUESTION FOR JURY.

In a prosecution for the murder of defendant's wife, where the defense was based on an alibi and that deceased committed suicide, testimony *held*, sufficient to carry the case to the jury.[1]

2. SAME—GREAT WEIGHT OF EVIDENCE.

A verdict of guilty in the first degree, *held*, after careful consideration of the entire record, not against the weight of the evidence.[2]

3. WITNESSES—EVIDENCE—ADMISSIBILITY—CREDIBILITY OF WITNESS.

Evidence of a statement made by defendant's brother to the assistant prosecuting attorney, charging defendant with the commission of the crime and the stenographer's report of a conversation between defendant and his brother in regard to said statement, *held*, properly admitted for the purpose of testing the brother's credibility, where his testimony on the stand was at variance with said statement.[3]

4. CRIMINAL LAW — WHETHER STATEMENT VOLUNTARY QUESTION FOR JURY.

Where defendant's brother claimed that his statement charging defendant with the commission of the crime was not voluntary but was obtained by force and intimidation, which was denied by the prosecution, the court properly left the question of its acceptance or rejection to the jury.[4]

5. SAME—ACQUIESCENCE IN STATEMENT INCRIMINATING DEFENDANT.

The statement of a third person in the presence of the accused, implicating him in the commission of an alleged crime, is not admissible unless and until it clearly appears that the defendant, by his words or conduct, acquiesced in the statements so made and admitted the truth thereof.[5]

6. SAME—REPLY OF DEFENDANT RENDERED STATEMENT ADMISSIBLE.

It was not error to admit in evidence that part of de-

---

[1]Homicide, 30 C. J. § 570; [2]Id., 30 C. J. § 559; [3]Witnesses, 40 Cyc. p. 2687; [4]Criminal Law, 16 C. J. § 2291; [5]Id., 16 C. J. § 1256.

fendant's brother's statement implicating defendant in the commission of the crime which was read in defendant's presence, where defendant replied thereto in mixed language of denials and admissions.[6]

7. SAME—DEFENDANT'S REPLY TO STATEMENT ADMISSIBLE.
   The effect of defendant's equivocal replies and assertions to the statement of his brother implicating defendant in the commission of the crime was correctly submitted to the jury under proper instructions.[7]

8. SAME—EVIDENCE—CURING ERROR—APPEAL AND ERROR.
   The admission of testimony by a fellow prisoner of defendant as to an alleged conversation between another prisoner, who, it later developed, he did not know and whose name he could not give, and defendant, in which the latter made an incriminating statement, if erroneous, was cured by the striking out of said testimony by consent of both sides, and by the court's instruction to the jury to disregard it entirely.[8]

9. SAME—PHOTOGRAPHS—ADMISSIBILITY.
   Where a witness, who lived across the street from the house in which the crime is alleged to have been committed, had testified that on the night of its commission, in July, she had seen a light go on and off in the upper front room of said house, the admission in evidence of a picture of said house, although taken when the leaves were off the trees, was not prejudicial, in view of the fact that another picture, with the leaves on the trees, was introduced, and the photographer who identified both pictures, testified that both showed said upstairs window, although the one where the leaves were on not as clearly as the other.[9]

10. SAME—TRIAL—VIEW OF PREMISES—ABUSE OF DISCRETION.
    There was no abuse of the court's discretion in refusing to allow the jury to view the premises where defendant's brother roomed, and where defendant claimed he stayed the night the crime is alleged to have been committed.[10]

11. SAME—EVIDENCE—IDENTIFICATION OF DEFENDANT.
    Testimony by a street car conductor identifying defendant and his brother as passengers on his car on the night in question, which if standing alone might not be adequate

6Criminal Law, 16 C. J. § 1262; 7Id., 16 C. J. § 2287; 8Id., 17 C. J. § 3670; 9Id., 17 C. J. § 3664; 10Id., 16 C. J. § 2090.

to sustain a conviction, yet, where supplemented by the positive testimony of the motorman, *held*, competent for the jury to consider in connection with the other evidence of identification.[11]

12. Same—Trial—Power of Court to Control Crowds.
When the crowds swarm in and around the court room and either by their size or conduct interfere with the orderly conduct of a trial and due administration of the law, the court has power to and should adopt proper measures of repression.[12]

13. Same—Constitutional Law—Public Trial.
Defendant's claim that he was deprived of his constitutional right to a public trial by the denial to persons of the right of ingress and egress to and from the court room while the trial was in progress, *held*, not sustained by the record.

Error to recorder's court of Detroit; Keidan (Harry B.), J. Submitted October 16, 1924. (Docket No. 165.) Decided April 3, 1925.

Michael Greeson was convicted of murder in the first degree, and sentenced to imprisonment for life in the State prison at Marquette. Affirmed.

*Edward N. Barnard*, for appellant.

*Andrew B. Dougherty*, Attorney General, *Paul W. Voorhies*, Prosecuting Attorney, and *John V. Brennan*, Assistant Prosecuting Attorney, for the people.

Steere, J. Defendant was tried and convicted in the recorder's court of the city of Detroit, of first degree murder of his wife, Lillian Greeson, at their apartments in said city on the 19th day of July, 1920, and sentenced to life imprisonment in the State prison at Marquette. The case was removed to this court by writ of error. The voluminous record of over 1,000 pages shows a protracted and exhaustive trial

---

[11]Criminal Law, 16 C. J. § 1050; [12]Id., 16 C. J. § 2049.

with active effort on the part of defendant's counsel to make and save all possible objections known to the technique of criminal defense, there being in the record 97 requests and 210 assignments of error filling some 79 pages of the record.

Defendant's counsel interrogatively groups the more important questions raised by the assignments as follows:

"(1) Did the court err in admitting in evidence the statement of Maurice Greeson?

"(2) Did the court err in admitting in evidence the stenographic report of conversation between Michael and Maurice Greeson?

"(3) Did the court err in admitting in evidence the testimony of Charles Hammond?

"(4) Did the court err in admitting in evidence the photograph of the Millner home taken from Mrs. Lee's residence October 14, 1920?

"(5) Should the court have granted defendant's motion to permit a view of the Jefferson avenue rooming house?

"(6) Did the court err in permitting the witness Clair Chorpening to testify concerning two certain men seen by him after the commission of the crime and several miles from the scene?

"(7) Did the court err in refusing defendant's motion for a new trial upon the ground that defendant's constitutional rights were not safeguarded and he was not accorded a public trial?"

Defendant, Michael Greeson, a native of London, England, came to America in August, 1916, when about 16 years of age, arriving in New York where he remained for a few months and then went to Detroit. He first found employment with the Maxwell Motor Car Company where he worked for about two years, when his brother Maurice came from England and joined him in January, 1918. The two boys lived together for about six months, when Maurice enlisted in the United States army and was absent from Detroit until some time after the war was over. De-

fendant remained in Detroit and for a time worked in an ammunition factory, later finding employment with the Wadsworth Manufacturing Company, the Dodge Motor Car Company and perhaps elsewhere, as he testified to working for the Cadillac company and later in his testimony denied that he ever worked there.

On his brother's return from the army he went to work for the Wadsworth Manufacturing Company and they lived together in a rooming house at 2638 East Jefferson avenue, until defendant went to England early in the spring of 1920 for a few weeks' visit. While there he married his wife, Lillian, who returned with him to Detroit. They lived for about two weeks in apartments on Bagg street and then moved to rooms in the home of Max Millner at 492 Forest avenue, west, where they were living at the time of her death. He testified that she was then in the family way, disliked Detroit, complained of being homesick and wanted to return to England. As to this he testified that he consented to her going, and in another portion of his testimony said, "I was going to let her go back, but I changed my mind about a week later." He also testified:

"My wife insisted we both get insured. She said the fatalities during child-birth were very great, and it would be worth while to get insured, covering that period. I argued against it, but to avoid an argument I consented."

On June 19, 1920, he went to the office of the Equitable Life Insurance Company in the Union Trust building and applied on blanks furnished him for insurance of the lives of his wife and self for $6,000 each. His wife was not with him and he took her application to have it signed by her. It contained a statement that she was not pregnant. Their physical examinations by the insurance company's physician

were favorably reported, the premiums were paid and the papers, including the prepared policies, medical report, etc., were forwarded to the home office for approval.    The physician who made the examinations testified he discovered no indications that Mrs. Greeson was pregnant, and that in reply to his inquiry she said she was not.    Defendant stated he mentioned the fact that his wife was pregnant to the insurance company's agent "and he went on writing the policy just as though it didn't make any difference."    This the agent denied, but said defendant told of his wife's contemplated trip to Europe; that defendant's wife never was at his office to his knowledge and he never saw her.    On July 10th defendant called at the insurance office and asked about the policies.    The agent was out but the stenographer in charge of the office informed him that the policy on his life had been issued and the one upon the life of Lillian Greeson had not yet been issued.    On July 14th or 15th the agent sent him word that the policies had been received and on July 17th, the Saturday preceding his wife's death, he went to the office and they were delivered to him.    Both policies were for $6,000 with a provision doubling the amount in case of death caused by accident or violence.    They were taken by him to his brother's room and left there.

At the time of Mrs. Greeson's death those living in the Millner home consisted of Max Millner, his wife, their two daughters, Mrs. Anna Funke and Bessie Millner, Pauline Rosen, who roomed there, defendant and his wife.    The house is a single dwelling on the north side of Forest avenue between Avery and Twelfth street, about 170 feet from the corner of Twelfth street and 320 from the corner of Avery. From the front porch to the lot line is about 30 feet. The front hall is about 11 feet in length, access to the second floor being had either from the living room or

230—Mich.—9.

kitchen. The rooms occupied by defendant and his wife were on the upper floor on one side of the stairway and a hall about 13 feet long off from which were other rooms including a bathroom. Their bedroom was directly over the front portion of the sitting room with two windows facing out on Forest avenue. While occupying these quarters defendant and his wife took their meals with the Millner family. Members of the family testify that defendant seldom conversed to any extent with his wife in their presence. Mrs. Millner described Mrs. Greeson as sociable and generally cheerful but at times complaining of being homesick. She had heard her find fault with this country, which she did not like, and express a desire to go home to her folks, had occasionally heard quarreling between her and defendant but "didn't hear him say anything to her that was mean."

On Sunday, July 18th, defendant was at home in the morning but answered a telephone call and then left shortly before 10 o'clock, and was not seen again by any of the people living there until after the death of his wife and his arrest. Five members of the household carried keys to the front door—Millner and his wife, their daughter Bessie, Pauline Rosen, the young lady who roomed there, and defendant.

On that Sunday the members of the household went their various ways with no suggestion of any unusual conditions. Mrs. Greeson was at the home all that day, except for a time in the evening when she was out walking with Mrs. Millner and her daughter Mrs. Funke, who described her as in a cheerful frame of mind, laughing and joking, and after their return they had a little lunch before retiring and she was "happy and jolly." Mr. Millner was at home during the evening and testified that he retired before the others returned. He said that before retiring he locked up the house, closed the front door, which locked automatically on being closed, but did not put on the

night chain because he knew others were out.    Miss Rosen testified that she spent the evening away from there, returning home about 11:30 o'clock, found the door locked and unlocked it with her key.    She then saw Mrs. Greeson who had not yet retired and talked with her.    "She was very cheerful, laughing and talking."    When they went upstairs she was in Miss Rosen's room for a short time chatting and then went to her own room at about 12 o'clock.    Bessie Millner, who was also away during the evening, testified that she returned about 12:30, after the rest had all retired, and she did not see any one.    She locked the door on entering the house, went past Mrs. Greeson's room to the bathroom and back and then retired about 20 minutes to 1 and heard no sounds at all until awakened by her mother screaming.    She occupied the same room as Miss Rosen, and Mrs. Funke slept in another room with their mother, while Mr. Millner occupied the remaining room upstairs.

Mrs. Millner testified that she fell asleep soon after she retired and later woke about 2 o'clock, hearing Mrs. Greeson moaning.    She arose, switched on the hall light and went into her room, the door being then half open.    She found her lying partly across the bed which was "full of blood" and then called her husband, screaming so as to awaken all the other occupants of the house.    He at once entered the room, his wife and others of the family following, turned on the light in there and saw Mrs. Greeson lying motionless on the blood-stained bed, dressed in her nightgown with her head on the pillow, her face turned away from the wall and her body partly across the bed, her feet at the edge of or over the outside.    Mrs. Millner said she at first unsuccessfully tried to awake her but was too excited and "rushed right out."    Mr. Millner said he knocked on her limbs and she made no response, he noticed her eye was bruised, there was blood on the pillow and on her face, and they called the

police station as soon as they could get them by 'phone. The auto-patrol quickly responded, they were received at the door by Millner and directed to where Mrs. Greeson was. The first officer in said he found her on the bed with her throat cut and quantities of blood on the bed and pillow. He spoke to her and she did not answer, but yet showed signs of life, moving her eyes and arms. They brought a stretcher from the patrol-auto and immediately sent her to the receiving hospital.

Dr. Dick, the county physician who made an examination and autopsy of the body of Mrs. Greeson that day, testified that he found an incised wound 5 inches long on her neck, entering the wind-pipe, an incised wound 3½ inches long under her chin, a lacerated wound on the first finger of the right hand, an incised wound on the elbow, two contused lacerated wounds in the right parietal region with a compound, comminuted fracture of the skull beneath one of them. The wounds on the skull were side by side running into each other, and gave the fracture of the skull as the cause of her death in his opinion.

Some of the officers remained at the house after the patrol-auto left, a precinct detective arrived and they made an investigation of conditions in and around the place, finding no indications of an intruder having been there or any disturbed conditions except at and around deceased's bed.

A Mrs. Annie Lee lived across Forest avenue from the Millner residence with her husband who worked nights and usually came home between 12:30 and 1 o'clock. On that night she retired about 9 o'clock and got up about 1 o'clock to watch for her husband because he was late in getting back. She sat in the dark by the window of her bedroom, which was in the front part of the house downstairs, there being street lights at the corners of Avery and Twelfth streets. While thus watching for her husband she noticed a

young man standing on her side of the street apparently watching the Millner home.    He walked back and forth looking in that direction, standing still at times—once directly in front of her house.    While noting his conduct she saw a light go on in the front room upstairs in Millner's house.    After a time she saw it go out and very soon thereafter a man came quickly out of the front door, when the man she had been watching crossed the street and joined him. They then walked rapidly away together towards Avery street and turned on it towards the cross-town car line.    She described them as similar in size and dress, both wearing sailor hats.    She could not clearly distinguish their features, but identified Maurice Greeson by his appearance and walk as the young man who walked up and down past her house.

George Edmiston, an old Detroit United Railway motorman who operated a car on the Jefferson-Grand River line that night, running to the city limits, testified that he saw two whom he identified as the Greesons, sitting in the first seat on the right-hand side of his car when he stopped at the car barns about 2:25 a. m., and they were yet there when the car left the barns, but left the car before it reached the city limits, and he found a parcel left in the seat where they had been sitting which he called to the attention of the conductor and put near his brakewheel in the vestibule ready to return if called for.    On the return trip they got aboard again, and he first saw them that time as he was busy watching while running around the Coplin curve, when defendant asked him if he had found a parcel.    He first looked at them and then said "Here it is," handing it to defendant who said "It is my brother's."    He stopped the car for them to get off at Drexell avenue.

The officers found defendant at his brother Maurice's room at 2638 Jefferson avenue during that day—July 19, 1920.    His defense was an absolute denial and

alibi, claiming he stayed with his brother the night before in his room where they found him.   He said that was the first night he had been absent from home since his wife came to Detroit, and testified that his reason for absence from home from Sunday forenoon until his arrest was because his brother Maurice was sick and "hadn't been working for the last three weeks." He told, however, of playing checkers with Maurice, of their going to the theatre, out to meals and walking from his brother's lodgings to the water works park and back, a distance of about two miles, during the time he claimed his brother's sickness necessitated his day and night absence from home.   Maurice testified that he was and had been for some time troubled by rheumatism in his legs and was taking medicine for it, but also stated in different parts of his testimony that in the month of July, 1920, he worked for the Wadsworth Manufacturing Company, that "the two days just preceding Lillian Greeson's death I was employed at the Hudson Motor Car Company, I was a drill press hand," that on Saturday, July 17th, he met defendant at the Avenue theater and had a late dinner with him; they then took a walk to the water works and back, his rheumatism bothered him a little but he "was not in pain;" and on the next day, Sunday, they went to various places, again walked to the water works park and back in the evening, played checkers for a time after their return to his room on Jefferson avenue and went to bed "about 10:30 or 11:30 o'clock." Of the rest of that eventful night he said:

"I went to sleep and Michael went to sleep.   I did not wake up at all during the night, nor did Michael that I know of.  *  *  *  I slept all night.  *  *  * We got up in the morning about 7:30."

That defendant's wife met her death at their apartments in the Millner residence on Forest avenue at the time charged and was discovered under the circum-

stances stated is not questioned.   It is the theory and claim of the prosecution that the facts and circumstances proven convincingly show her death was caused by violence at the hands of defendant, the motive which actuated him being the $12,000 indemnity provided in the insurance policy on her life which he held as also indicated in that connection a desire to be free from her.   In addition to absolute denial and claim of alibi the defense stressed the theory of suicide in explanation of her death and the condition in which she was found.   Much testimony was directed to that theory by answers of experts to hypothetical questions and otherwise.   The conflicting testimony bearing on both theories was carefully submitted to the jury under a very clear and able charge which fully explained their duties, and detailed the rights of a defendant and safeguards which the law throws around him when on trial for commission of a felony.   The arguments in counsel's brief upon the disputed facts as developed by the testimony need not be discussed.   It is sufficient to say that there was abundant testimony to carry the case to the jury and we cannot find after careful consideration of the entire record that the verdict was against the weight of evidence.

Defendant's contention that the court erred in admitting evidence of a statement made by Maurice Greeson and the stenographer's report of a conversation between him and Michael may be considered together.   They were both taken into custody on July 19, 1920.   Maurice was at first held as a witness at the Hunt street station and Michael was taken to Central station and held under a charge of murder. Both were later charged with the crime, but before the case came to trial an order of *nolle prosequi* was entered as to Maurice.   Both made statements to an assistant prosecuting attorney which were taken by

a stenographer and transcribed. They were of similar import to their testimony on the trial and, if true, clearly established an alibi for both. Maurice made a second statement two or three days later to another assistant prosecuting attorney after being told that a woman across the street saw him and his brother at or near the Millner home and a street car motorman saw them that night, with other evidence claimed to have been secured against them. It in substance charged Michael with commission of the crime and described how he related to Maurice what he had done. When Michael was told of his brother's confession he claimed he did not believe he had made one and the two were brought together. Their conversation in presence of the attorney and other officers was taken down by a stenographer. After they had greeted each other Maurice told Michael he had "confessed everything" and the latter replied "You are off your head." Their conversation then ran in part as follows:

"*Maurice:* 'It's no use, really, for two of us being put away. One of us'—

"*Michael:* 'I will get you out from this. I will frame something to get you out, if I have to say I did it; I will frame something to get you out. I will get you out of it. This is my affair.' * * *.

"*Maurice:* 'I told the truth. He will read the confession to you, and you will see whether it is true or not.'

"*Michael:* 'You are just making as ass of yourself. Read that confession, will you, please?' "

After listening to the stenographer reading it for a time Michael said:

"That's enough, stenographer, we are going, we are both going to be charged with first degree murder. Let me tell you—What is wrong with you? You have been made crazy—they simply made a wreck of you."

To which Maurice replied: "No, they haven't."

Their conversation was then resumed, a portion of which was as follows:

"*Michael:* 'Leave it to me.   If you are found guilty, and I am found guilty, I will frame something to get you out.'

"*Maurice:* 'It's no use framing.   The detective says, and everybody knows the evidence against the two of us.'

"*Michael:* 'That's all right.'

"*Maurice:* 'Something had to be done.'

"*Michael:* 'Just leave it to me, and I will get you out at any cost.   Listen, Maury, pull yourself together.   Be brave.   I can see this place making a wreck of you.'

"*Maurice:* 'They never bothered me at all.'

"*Michael:* 'Never mind.   It is preying on your mind. Just—This is my affair, and not yours.   Just understand that.   Pull yourself together and leave it to me, and I will get you out.   When I confess, if I confess, I will do it right—  *  *  *  Yes, the motorman saw us take a bundle.'

"*Maurice:* 'They are'—

"*Michael:* 'Leave it to me.   Promise me, you will leave it to me.'

"*Maurice:* 'All right, if we get put in for life, G—d d—n it—.'

"*Michael:* 'All right, never mind about that, I will see to it that you get out.'

"*Maurice:* 'No question about that?'

"*Michael:* 'No question about that.   I am going in for life, I know that, absolutely no question.   I will get you out.   You will stay out, Maury.'

"*Maurice:* 'Can't be two of us put in for life?'

"*Michael:* 'Yes, they can.   From that statement both of us put away.   They can.   Say your confession is a lie.' "

And that is what Maurice did say in substance when called by the prosecution as a witness during the trial. His testimony was radically at variance with his second statement and favorable to the defendant.   It was competent for the court to permit the prosecutor to interrogate him as to that statement and use it to

test his credibility, to which purpose the court carefully limited it when admitted and when charging the jury.   *People* v. *Nichols*, 159 Mich. 355; *People* v. *Ayers*, 186 Mich. 366.   A further contention against the admissibility of any part of the second statement by Maurice is that it was not voluntary but obtained by force and intimidation.   He so testified with an extreme story of violence and abuse heaped upon him by officers to that end.   This was flatly denied by testimony of the prosecution and refuted by himself in his conversation with his brother as above quoted.   The court left that question of fact to the jury, saying in part that if they found those statements "were not voluntary, or if you find they were made because of hopes held out to him, or because of fear, or because of inducements made to him, to make admissions, you will reject them."   Defendant Michael was a witness in his own behalf.   Of his treatment while confined he said in part:

"I talked with Mr. S— (the assistant prosecutor) absolutely voluntarily.   *   *   *   I have no complaint to make against the detectives; the only complaint against the police officers is, when they wanted to know too much when I should be sleeping.   That is the only complaint.   No violence of any kind.   Not at any time.   No officer ever laid a hand on me."

The court admitted, against objection, the portion of Maurice's second statement read to Michael until he said "That's enough, stenographer" and the colloquy between the brothers at that time, upon which Michael was interrogated, as tending to show his acquiescence in or admission of the truth of accusing statements. Defendant's claim of error is based on the assumption that there was no acquiescence but an absolute denial. On that assumption of fact it is pointed out in his counsel's brief with citation of abundant authority that:

"The statement of a third person in the presence of the accused, implicating him in the commission of an alleged crime, is not admissible unless and until it clearly appears that the defendant, by his words or conduct, acquiesced in the statements so made and admitted the truth thereof."

That general rule of evidence is not to be questioned, but it is urged by the prosecution that defendant did acquiesce in fact and effect by words and conduct. He recognized that the accusation made in his presence and to him called for a reply.    He did reply repeatedly and at length, in mixed language of denials and admissions running through his talk with his brother as above quoted from.

In *Commonwealth* v. *Trefethen,* 157 Mass. 180 (31 N. E. 961, 24 L. R. A. 235), a lengthy murder case, where the question of acquiescence by silence arose, the court said with reference to a similar situation as follows:

"When a statement is made in the presence and hearing of a defendant which, if true, tends to show that he is guilty, and he remains silent or makes an equivocal reply, the rule of law has been stated to be as follows:

" 'The rule is that a statement made in the presence of a defendant, to which no reply is made, is not admissible against him, unless it appears that he was at liberty to make a reply, and that the statement was made by such person and under such circumstances as naturally to call for a reply unless he intends to admit it.    But if he makes a reply, wholly or partially admitting the truth of the facts stated, both the statement and the reply are competent evidence.' *Commonwealth* v. *Brown,* 121 Mass. 69, 80 (citing authorities).  *  *  *

"If in one conversation some of the replies of the defendant had some tendency to show guilt, and some were explicit denials of guilt, we cannot say that the defendant has been prejudiced by the admission in evidence of all that was said at that interview directly or indirectly relating to his guilt or innocence, if the

jury were properly instructed upon the application to be made of this evidence."

This view finds support in *People* v. *Courtney*, 178 Mich. 137, and *People* v. *Foster*, 211 Mich. 486. The trial court properly submitted the equivocal replies and assertions of defendant to the jury with the following instructions upon the application to be made of such evidence in part as follows:

"The people in this case have introduced in evidence certain alleged statements, made by the defendant to a member of the prosecuting attorney's staff and certain police officers, after certain alleged statements made by the defendant's brother, Maurice Greeson, to them were read over to the defendant in the presence of the said Maurice Greeson. If you find that the conversation of Michael Greeson at that time shows a denial of the statements made by his brother, Maurice Greeson, it will be your duty to disregard each and every item of the statement made by Maurice and to strike the same entirely from your minds and not consider the statement as read by Mr. Silberblatt or any one else in any way or manner in arriving at your verdict. The question of whether or not the statement made by Maurice was denied by Michael, is for you to decide, and if you decide that Michael did not admit the truth of the statement so far as admitting the commission of the offense by himself, even though he admitted any other part of the statement, you are thereupon to disregard the entire statement made by Maurice and strike the same from your minds, and in no way or manner consider the same in arriving at your verdict. On the other hand, if you find that any admissions were made by the defendant, when Maurice's alleged statement was read to him, and you further find that such alleged statements were made voluntarily, you will consider the statements of the defendant—himself only—with all the other evidence in the case."

One Charles Hammond was a prisoner in the county jail part of the time defendant was there. He was called as a witness by the prosecution and testified to

hearing a conversation between another prisoner and defendant in which the latter made an incriminating statement relative to the offense for which he was held, but when interrogated further stated he did not know the prisoner with whom defendant was talking and was unable to give his name. Counsel moved that his testimony be stricken out for that reason, to which the prosecution after some discussion between court and counsel consented, and in answer to the court's inquiry if it should be struck out by consent of both sides, defendant's counsel said:

"Yes, if the jury is instructed to disregard it entirely and take in no consideration the statement made by Mr. S——."

The court then discharged the witness, saying to the jury:

"I do instruct the jury then, to disregard any testimony by this witness. * * * wipe it out of your mind just as if it had not been testified to at all. * * * Just place yourselves in a frame of mind as if this witness had given no testimony at all."

The court again instructed the jury more at length in the general charge to entirely disregard Hammond's testimony. If there was any error in what had occurred it was cured.

Defendant's objection to admission of a photograph of the Millner home introduced to show its front and street surroundings could be seen by Mrs. Lee is based on the fact it was taken in October when the leaves were off the trees, while the trees were in full foliage in July when the crime is alleged to have been committed. There were various photographs in court showing locations and conditions in and around the place, among others one taken of the Millner residence in July when the trees were in foliage. Defendant's counsel called attention to that picture also and

showed it to the photographer who identified both
photographs.     It is undisputed that there was no
other change in the appearance or condition of the
premises between the times the two pictures were
taken.     The only possible ground for objection would
be its bearing upon Mrs. Lee's testimony relative to
seeing the light in the window upstairs that night.
The photographer testified that both pictures showed
the upstairs windows in the front of the Millner house
from where they were taken although not as clearly
in the one where the trees were in full foliage.     Mrs.
Lee testified positively that from where she was sitting
she saw the lights go on and off in the upper front
room of the Millner house that night and there is no
testimony to the contrary, direct or inferential.     The
pictures were but illustrative and explanatory of the
testimony of the respective witnesses, which it was for
the jury to pass upon.     We see nothing prejudicial
in admitting the photograph objected to in connection
with the other pictures of the locality.

Complaint is also made of the refusal of the court
to grant defendant's motion for an order that the jury
view the premises at 2638 Jefferson avenue where
Maurice roomed.     The court allowed the jury to view
the Hunt street station where Maurice claimed to have
been given the third degree, but did not deem it neces-
sary to send the jury to the premises where Maurice
roomed.     Even permitting the jury to view the place
of the crime is discretionary with the court.     *People
v. Winney,* 196 Mich. 347; *People* v. *Frontera,* 223
Mich. 258; 16 C. J. p. 826.     We find no abuse of dis-
cretion.

Chorpening, on admission of whose testimony error
is urged, was conductor on the car of which Edmiston,
who positively identified the Greeson brothers, was
motorman.     Chorpening testified that he remembered
seeing two men get on the car that night, who re-

sembled each other in size and dress, and their inquiring for a parcel.    He sent them to the motorman who had told him of finding one.    He remembered they wore stiff straw hats and dark clothes, and in general appearance resembled defendants, but he thought they were larger and did not know "if they were the two or not."    For the defendant it is urged that this testimony was incompetent under the ruling in *People* v. *Gotshall,* 123 Mich. 474.    An examination of that case discloses that a weaker line of identification than this was held incompetent as affirmative evidence of identification to sustain a conviction of arson.    The court said the verdict based upon such testimony "leads to a careful examination of the errors assigned."    Such examination resulted in the conclusion "that the respondent did not have that fair and impartial trial which the Constitution and law of this State guarantees him."    While Chorpening's testimony standing alone might not rise to the dignity of affirmative proof of identification adequate to sustain a conviction, supplementing the testimony of his motorman who observed the two men twice, the second time for identification in returning the package they asked for, it was competent so far as it went for the jury to consider in connection with the other evidence of identification.    *People* v. *Quigley,* 217 Mich. 213.

Defendant's claim that he was deprived of his constitutional right to a public trial was based on a number of affidavits of persons who were themselves or saw others denied ingress or egress to or from the court room while the trial was in progress by an officer stationed at the door, some stating there were at the time vacant seats in the court room and others that there was standing room.    The claim was first made to the trial court in defendant's' motion for a new trial and the affidavits on which it was based were met by counter affidavits denying that any persons were

excluded when there were vacant seats or the court room not crowded to capacity. In his reasons for denying the motion for a new trial the court said upon this subject:

"The entrance doors of the court room were not kept closed to prevent the public from entering the court room during the progress of the trial. The affidavits * * * filed in opposition to the granting of the motion for a new trial show conclusively that as many persons as could be accommodated were at all times permitted to enter the court room. No complaint was ever made to me during the trial on that account."

This was a sensational murder case which had been featured in the public press and attracted unusual attention. Early in the trial and before the jury was sworn, the attendance was such that the court said:

"I am glad to permit as many people as can get into the court room, without endangering the health of those in the court room, to enter the court room. I don't think it should be unduly crowded, because in the first place, it isn't conducive to good health, and there is danger in case anything happens—so I am going to permit the court room to be well filled, but not overcrowded."

This is the only announcement, or order, shown to have been made by the court during the trial, except directions for preservation of order in the court room occasioned by disturbing and unseemly conduct of certain spectators. It was shown by affidavits of the court officers who were in daily attendance, that the court room was crowded to its utmost capacity each and every day throughout the trial, there was not a session of said court held during the progress of said cause when the seats in the court room reserved for spectators were not fully filled, on various occasions persons congregated in the corridors attempted to gain admission by force and were so disorderly that

it became necessary to have from five to ten police officers present to maintain order, officers stationed in the court room during the trial had great difficulty in maintaining order and at times it was necessary to eject those creating disturbance, and upon various occasions when there was laughter amongst the spectators it was hard to suppress owing to the difficulty in ascertaining who the offenders were amongst the large number permitted to stand in the crowded court room.

Counsel for defendant inadvertently states in his brief that "it stands undisputed that all the doors of the court room were kept closed and locked during the charge of the court;" which it is claimed brings this case within the ruling in *People* v. *Micalizzi,* 223 Mich. 580. We are unable to find anywhere in this record any admission, or evidence by affidavit or otherwise, that the doors of the court room were ever locked while the trial was in progress. It is not disputed that an officer was stationed as a doorkeeper at the public entrance from the corridor to the court room, and that door was usually kept closed except as opened for persons to leave or enter. It is shown, however, without dispute that during the arguments of counsel and charge of the court the court room was crowded with spectators, both inside and outside the bar of the court.

In the *Micalizzi Case* it appeared that an officer announced before the judge charged the jury that the doors were about to be locked and those desiring to leave might do so, and that the doors were then locked and remained locked during the charge. How many left or remained is not shown, but it is stated that it did appear there were plenty of vacant seats in the court room. Of the situation on which that decision is predicated the court said:

"The record before us does not present a case of an

230—Mich.—10.

overcrowded court room, of the exclusion of children of tender age or the exclusion of witnesses, but does present a case where a part of the trial was conducted behind locked doors. The record presents a case where the public was excluded from a portion of the trial and one of the defendant's attorneys was prevented from being present during the charge of the court."

In *People* v. *Murray*, 89 Mich. 276 (14 L. R. A. 809, 28 Am. St. Rep. 294), the case was not reversed because the doors were closed and an officer stationed at the entrance to see that the court room was not overcrowded, but because the court conferred upon the officer discretionary power of partiality by instructing him "that all respectable citizens be admitted and have an opportunity to get in when they shall apply." It was there shown that persons were refused admission by the officer when seats provided for the public were practically vacant and few people besides those connected with the trial were present, and when counsel for defendant called the attention of the court to the fact that respectable citizens and taxpayers were refused admission, the court, after some reflections on counsel for mentioning it, said the officer had his orders and to "proceed with the trial." In distinguishing the *Murray Case* from *State* v. *Brooks*, 92 Mo. 573 (5 S. W. 257, 330), this court apparently approved of an order made in the *Brooks Case*, when the court's attention was called to the matter, "that all persons be admitted until all seats are filled."

Of the constitutional right to a public trial it is said in Cooley on Constitutional Limitations (7th Ed.), p. 441:

"By this is not meant that every person who sees fit shall in all cases be permitted to attend criminal trials; because there are many cases where, from the character of the charge and the nature of the evidence by which it is to be supported, the motives to attend

the trial on the part of portions of the community would be of the worst character, * * * and the requirement is fairly observed if, without partiality or favoritism, a reasonable proportion of the public is suffered to attend, notwithstanding that those persons whose presence could be of no service to the accused, and who would only be drawn thither by a prurient curiosity, are excluded altogether."

It is a matter of common knowledge that when the courts are required to try particularly sensational or salacious cases their court rooms are crowded and their doors besieged by a class of spectators whose tastes or instincts draw them there only on such occasions, and whose ignorance of or indifference in mass to court decorum often render it especially difficult to maintain order and properly conduct the trial. When the crowds swarm in and around the court room and either by their size or conduct interfere with the orderly conduct of a trial and due administration of the law, the court has power to and should adopt proper measures of repression. A public trial within the constitutional meaning of that term is well stated with supporting citations in the following excerpt from 8 R. C. L. p. 75, § 29:

"A public trial means one which is not limited or restricted to any particular class of the community, but is open to the free observation of all. This does not impose on the authorities a duty to provide so large a place for public trials as would accommodate every member of the community at the same time, for that would be plainly impracticable; but it does import a duty to make reasonable provision in that regard. If without partiality or favoritism a reasonable proportion of the public is allowed to attend, the requirement has been fairly observed. The important thing is to have the trial open to the general public. The fact that only a limited portion can be accommodated is of no consequence. * * * The court has the right to limit the number to be admitted to the seating capacity of the court room."

A careful examination of this lengthy record is convincing that the trial court conducted the case with commendable care, both in rulings during the trial and instructions to the jury as to the rights of the accused. We find no reversible error and the judgment will stand affirmed.

McDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.