DETROIT FREE PRESS v RECORDER'S COURT JUDGE

Docket No. 61056. Argued December 6, 1978 (Calendar No. 14).—
    Decided July 31, 1980.

    A high school teacher was charged with second-degree criminal
    sexual conduct with a 14-year-old student. Upon stipulation of
    counsel, the Recorder's Court of Detroit, George W. Crockett,
    Jr., J., ordered the suppression of all pretrial publicity in the
    case. On the day of trial, just before the selection of the jury,
    the trial court, without objection by the prosecution, granted
    the defendant's motion that the trial be closed to the public.
    The Detroit Free Press and its reporter assigned to the trial,
    Susan Brown, brought an action in the Court of Appeals for
    superintending control against the Recorder's Court Judge. The
    trial concluded with a verdict of not guilty before the Court of
    Appeals acted, so the action for superintending control was
    thereafter treated as an application for leave to appeal (Docket

REFERENCES FOR POINTS IN HEADNOTES

[1-6, 10, 12, 14, 15, 16, 19]
    20 Am Jur 2d, Courts § 39.
    21 Am Jur 2d, Criminal Law § 257 et seq.
    75 Am Jur 2d, Trial § 33.
    Right of accused to have press or other media representatives
        excluded from criminal trial. 49 ALR3d 1007.
    Exclusion of public during criminal trial. 48 ALR2d 1436.
[7] 58 Am Jur 2d, Newspapers, Periodicals, and Press Associations
        § 20.
    Right of accused to have press or other media representatives
        excluded from criminal trial. 49 ALR3d 1007.
[8] 21 Am Jur 2d, Criminal Law §§ 257-259.
[9, 18] 21 Am Jur 2d, Criminal Law § 262 et seq.
    Exclusion of public during criminal trial. 48 ALR2d 1436.
    Right of accused to have press or other media representatives
        excluded from criminal trial. 49 ALR3d 1007.
[11] 21 Am Jur 2d, Criminal Law § 257 et seq.
[13]21 Am Jur 2d, Criminal Law §§ 262, 265, 269.
    Exclusion of public during criminal trial. 48 ALR2d 1436.
    Right of accused to have press or other media representatives
        excluded from criminal trial. 49 ALR3d 1007.
[17] 21 Am Jur 2d, Criminal Law § 259.

No. 78-409). The plaintiffs appeal prior to decision by the Court of Appeals. In an opinion by Justice Moody, joined by Justices Kavanagh, Williams and Fitzgerald, the Supreme Court *held:*

1. The parties may not, by their mere agreement, empower a judge to exclude the public and press from the courtroom. The requirement of the Revised Judicature Act that the sittings of every court shall be public, except as otherwise provided by the statute, is applicable in this case. However, the defendant judge argues that the constitutional right to a public trial guaranteed by the Sixth Amendment of the United States Constitution and the similar provision of the state Constitution is a right of the accused alone and may be waived by the accused in the same manner as can any other substantive right enjoyed by the accused. The United States Supreme Court has recently held that the right of the public and press to attend criminal trials is guaranteed under the First and Fourteenth Amendments to the United States Constitution. The result in this case is consistent with the result reached by that Court and could now be predicated upon that holding. The parties have perfunctorily raised arguments concerning the First-Amendment right of the public and press to attend criminal trials. The Court's opinion in this case was primarily based on the common law as an alternate ground of decision.

2. The tradition of holding trials in public has existed for a long time and has enjoyed a favored position in English common-law courts. Early English commentators make it clear that the right to a public trial was one which inhered in the public and was not a right enjoyed by the accused. While the public was encouraged and often required to attend trials, the accused possessed few substantive rights and could hardly be said to benefit from a public trial. The common-law system of open and public trials was considered to be a natural check on possible abuse of judicial power. Public trials also could enlighten the public about their government and enhance respect for judicial remedies, but the most resounding theme of the commentators was the important role that publicity could have in insuring fairness and preventing abuse.

3. The Sixth-Amendment guarantee of a public trial, which has its roots in the common law, does not vest absolute rights in the accused. While the accused has the right to demand a public trial to insure fairness and to prevent judicial abuse, he has no corresponding right to compel a private trial. The concept of the public trial developed primarily for the benefit of the public. The societal interests served by the principle of public access to trials are separate from and at times may be in

opposition to the interests of the accused. The accused therefore cannot waive his right to a public trial in absolute derogation of the public interest. The public has an independent right to be present to see that justice is fairly done. It is important that citizens be free to observe court proceedings to insure a sense of confidence in the judicial process. Conducting trials behind closed doors might engender an apprehension and distrust of the legal system which would, in the end, destroy its ability to settle disputes peacefully.

4. Because a criminal prosecution is brought in the name of the people, the public has a substantial interest in seeing that its concerns are adequately represented. Since one of the purposes of the public trial guarantee is protection against perjury, the public has an important interest in assuring that criminal prosecutions are decided on truthful and complete records. Certainly the defendant would prefer an open proceeding to insure that perjured testimony is not brought against him, but the presence of the public also insures that no favoritism is afforded the defendant and protects against perjury by the defendant and his witnesses. It extends assurance that the appearance of justice is maintained. In addition, the public's concern extends to the actions of its legal officers, the judge and prosecutor; the performance of essential responsibilities by these officers during criminal trials should be open to public evaluation.

5. In rare specific circumstances, limitations have been placed on public access to criminal proceedings. However, the limitations imposed are few in number and, for the most part, are required to effect the essential dignity and the integrity of the trial process. In those rare instances where this integrity is compromised, the result may be reversal of a criminal conviction. The Supreme Court of the United States has recently held that the public has no affirmative constitutional right of access to a criminal pretrial proceeding in a case concerning pretrial suppression hearings, but the present case deals with the closure of the trial itself.

6. In its inception the right to a public trial was established for the benefit of the public alone, but it later developed to include protection of the accused. The protection or benefits conferred by the Sixth Amendment and the Constitution of Michigan include freedom from judicial or prosecutorial oppression, freedom from perjured testimony, and an assurance of basic fairness because transactions occur openly and publicly. But in providing protection to the accused, there was no intent to denigrate the interests of the public which are at the root of

the guarantee of a public trial. The public has a substantial interest in assuring that justice is openly and fairly meted out in its name, and must also be confident that its judicial representatives do not abuse the power which it confers upon them.

7. There are practical limitations on the ability of large numbers of the public to attend a trial, but this should by no means inhibit the public's interest in being informed. In this regard, the public must depend upon a vigorous press to keep it advised. With respect to judicial proceedings in particular, the function of the press is to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice. Thus, the press acts as a segment of the public in guaranteeing the openness and integrity of the trial. Upon occasion the tactics of a defendant and prosecutor may coincide to demand closure, but the people's interest may be asserted by members of the public when necessary because the participants in the trial, including the judge, may not fully recognize or appreciate fundamental societal interests.

8. Under extraordinary circumstances, to preserve the due-process right to a fair trial, an accused may request that the public's access to a trial be limited or temporarily denied. Upon such a rare occasion, the court must exercise its discretion to balance carefully the fundamental common-law principle of open trials against the specific circumstance that allegedly endangers a fair trial. An accused who seeks closure has the heavy burden of showing by a substantial probability that prejudicial error denying the accused a fair trial will result from proceeding in public. In addition, it must be shown that there is a substantial probability that closure will be effective in dealing with the danger and that no alternatives to closure exist that would protect the right to a fair trial.

9. One wrongfully accused can suffer acute embarrassment and damage to reputation through trial. However, because it is not only the accused who has interests in the trial, any limitation on the public's right to attend a trial must adhere to a standard that there is a substantial probability that prejudicial error denying the accused a fair trial will result. It is the legislative policy of this state, with certain specific exceptions, that the sittings of every court shall be public. The clear legislative directive is fully compatible with the constitutional rights expressed in the Sixth Amendment and the Constitution of Michigan, and may be accommodated with due-process rights requiring a fair trial. In this case, the accused made no showing of substantial probability that prejudicial error denying the accused a fair trial would result if the trial were to proceed in

public. Nor did the trial court give fair and full consideration to the public's interest in an open proceeding. Therefore, the order closing the trial to the public was in error.

Justice Levin, joined by Chief Justice Coleman, concurred in the result but would recognize that the Supreme Court of the United States has now declared that the public has a right under the First Amendment to attend criminal trials.

1. Michigan cases have established that, under the Revised Judicature Act, the mere agreement of the parties is insufficient to warrant closure of the trial. The only additional question presented in this case is whether a defendant has an implied constitutional right to a private trial. It appears that the Supreme Court of the United States, in holding that the public has a First-Amendment right to attend criminal trials, has decided that the Sixth Amendment does not give a defendant an implied right to a private trial. In the light of that decision, the Supreme Court of Michigan should also recognize the First Amendment in the disposition of this case.

2. The public's First-Amendment right to attend public trials is not absolute. It is sufficiently strong, however, that closure may be ordered only upon a finding that it is required to protect the defendant's superior right to a fair trial, or that some other overriding consideration requires closure. The finding must rest upon substantial evidence developed at an evidentiary hearing, which was not done in this case. The order of closure was therefore improper.

3. The Court should not attempt in this case to define the circumstances in which a defendant's right to a fair trial will be violated unless closure is ordered, beyond requiring that the alternatives to closure be explored and found inadequate before there is such an order. Nor would it be proper to catalogue any other overriding considerations which would justify restriction of the public's constitutional right to attend. The determination whether an order to close a trial is proper should be made in the context of a case in which a trial judge has made such findings after an evidentiary hearing.

Justice Ryan, dissenting from the grounds of decision, would hold that the public, including representatives of the press, have a constitutional right, under the First Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, to attend criminal trials. Seven Justices of the Supreme Court of the United States have recently agreed that the First Amendment guarantees such a right to the public. The Court in this case holds that the public has a mere *interest* in access to criminal trials based upon the

common law and the statute, and declines to recognize a constitutional right of access, suggesting that its preference for "an alternate ground for decision" is because the parties only "perfunctorily" raised First-Amendment arguments. While it is true that the appellant's claim in this case was based on the Sixth Amendment, the parties also raised and replied to an "arguable" First-Amendment claim. In any event, the Court now has the guidance of the Supreme Court of the United States, and should follow it.

### OPINION OF THE COURT

1. COURTS — PUBLIC SESSIONS.

The parties to a criminal trial may not, by their mere agreement, empower a judge to exclude the public and press from the sittings of the court (MCL 600.1420; MSA 27A.1420).

2. COURTS — PUBLIC SESSIONS — SIXTH AMENDMENT.

The Sixth Amendment guarantee of the right to a public trial does not vest absolute rights in the accused; the accused has the right to demand a public trial to insure fairness and to prevent judicial abuse but has no corresponding right to compel a private trial (US Const, Am VI; Const 1963, art 1, § 20).

3. COURTS — PUBLIC SESSIONS — SIXTH AMENDMENT.

An accused cannot waive his right to a public trial in absolute derogation of the public interest in seeing that justice is administered openly and publicly (US Const, Am VI; Const 1963, art 1, § 20; MCL 600.1420; MSA 27A.1420).

4. COURTS — PUBLIC SESSIONS.

The public has an independent right to be present at a criminal trial to see that justice is fairly done; the right to a public trial is not solely for the benefit of the defendant (MCL 600.1420; MSA 27A.1420).

5. COURTS — PUBLIC SESSIONS — SIXTH AMENDMENT.

The provision of protection to the accused by the constitutional guarantee of a public trial was not intended to denigrate the interests of the public, which are at the root of the guarantee of a public trial (US Const, Am VI; Const 1963, art 1, § 20).

6. COURTS — PUBLIC SESSIONS.

The public has a substantial interest in assuring that justice is openly and fairly meted out in its name and that its judicial representatives do not abuse the power which the public confers upon them.

7. NEWSPAPERS — COURTS — PUBLIC SESSIONS.

The press serves as a segment of the public in guaranteeing the openness and integrity of the trial process because there are practical limits on the ability of large numbers of people to attend a trial; each person has limited time and resources with which to observe the operations of government and relies necessarily upon the press to bring him in convenient form the facts of those operations.

8. COURTS — PUBLIC SESSIONS — PARTIES.

The principle that the public has an interest in a public criminal trial, which is deeply rooted in the common law, may be asserted by members of the public when necessary because the trial participants, including the trial judge, may not fully recognize or appreciate fundamental societal interests (MCL 600.1420; MSA 27A.1420).

9. COURTS — PUBLIC SESSIONS — DUE PROCESS — FAIR TRIAL.

An accused, to preserve the due-process right of a fair trial, under extraordinary circumstances may request that the public's access to a trial be limited or temporarily be denied; the trial court in such a case must exercise its discretion to balance carefully the fundamental common-law principle of open trials against the specific circumstance that allegedly endangers a fair trial.

10. COURTS — PUBLIC SESSIONS — DUE PROCESS — FAIR TRIAL.

An accused who seeks closure of a criminal trial has the heavy burden of showing by a substantial probability that prejudicial error denying him a fair trial will result from proceeding in public, that closure will be effective in dealing with the danger, and that no alternatives to closure exist that would protect the right to a fair trial.

11. COURTS — PUBLIC SESSIONS.

Any limitation on the public's right to attend a trial must adhere to a standard that there is a substantial probability that prejudicial error denying the accused a fair trial will result.

12. COURTS — PUBLIC SESSIONS — SIXTH AMENDMENT — DUE PROCESS — FAIR TRIAL.

It is the legislative policy, with certain specific exceptions, that the sittings of every court shall be public; the clear legislative directive is fully compatible with the constitutional rights expressed in the Sixth Amendment and the Constitution of Michigan, and it may be accommodated with due process rights

requiring a fair trial (US Const, Am VI; Const 1963, art 1, § 20; MCL 600.1420; MSA 27A.1420).

13. COURTS — PUBLIC SESSIONS.

The possibility that a public trial of a teacher accused of criminal sexual conduct with a student would influence other students to accuse their teachers falsely and would ruin the accused teacher's reputation does not present a showing of substantial probability that prejudicial error denying the accused a fair trial would result if the trial were to proceed in public.

14. COURTS — PUBLIC SESSIONS.

The public may not be excluded from a criminal trial without full and fair consideration of the public's interests in maintaining an open proceeding even if the defendant waives his right to a public trial with the consent of the prosecutor (US Const, Am VI; Const 1963, art 1, § 20; MCL 600.1420; MSA 27A.1420).

OPINION BY LEVIN, J.

15. COURTS — PUBLIC SESSIONS.

*The Revised Judicature Act entitles the public to attend the sittings of every court; the mere agreement of the parties to a suit is insufficient to warrant closure (MCL 600.1420; MSA 27A.1420).*

16. COURTS — PUBLIC SESSIONS — FIRST AMENDMENT — CONSTITUTIONAL LAW — DUE PROCESS — FAIR TRIAL.

*The public has a constitutional right, under the First Amendment, to attend criminal trials; the right is not absolute, but it is sufficiently strong that closure may be ordered only upon a finding that it is required to protect the defendant's superior right to a fair trial, or that some other overriding consideration requires closure (US Const, Am I).*

17. COURTS — PUBLIC SESSIONS — SIXTH AMENDMENT — CONSTITUTIONAL LAW.

*The Sixth-Amendment right to a public trial does not give a defendant an implied right to a private trial (US Const, Am VI).*

18. COURTS — PUBLIC SESSIONS.

*A finding that defendant's right to a fair trial, or some other overriding consideration, requires closure of a criminal trial must rest on substantial evidence developed at an evidentiary hearing; such a finding implies that the alternatives to closure*

*have been explored and found inadequate (US Const, Am I; MCL 600.1420; MSA 27A.1420).*

OPINION BY RYAN, J.

19. COURTS — PUBLIC SESSIONS — CONSTITUTIONAL LAW — FIRST AMENDMENT — FOURTEENTH AMENDMENT.

*The public, including representatives of the press, have a constitutional right to attend criminal trials, which is guaranteed by the First Amendment of the United States Constitution and made applicable to the states by the Fourteenth Amendment (US Const, Ams I, XIV).*

*Kenneth Murray* and *Brownson Murray* for plaintiffs.

*Alphonso R. Harper* for the defendant Recorder's Court Judge.

BLAIR MOODY, JR., J.

## PREFACE

The issuance of this opinion was held pending the release of *Richmond Newspapers, Inc v Virginia,* 448 US 555; 100 S Ct 2814; 65 L Ed 2d 973 (1980). In *Richmond,* the United States Supreme Court held that the right of the public and press to attend criminal trials is guaranteed under the First and Fourteenth Amendments of the United States Constitution. The result in this case is consistent with the result reached in *Richmond* and could now be predicated upon the holding in *Richmond.*

In the instant case, the parties perfunctorily raised First-Amendment arguments. Our analysis consists of an alternate ground for decision to that contained in *Richmond* and is primarily based upon the common law.

## INTRODUCTION

The underlying issue before this Court is whether and upon what rationale a trial judge may exclude the public, including the press, from attendance at a criminal trial upon the affirmative waiver by defendant of the right to a public trial. Specifically in this case the question is: Did the trial judge act properly in issuing the order of exclusion?

On the basis of common law and § 1420 of the Revised Judicature Act,[1] we conclude that the public may not be excluded from a criminal trial without first giving full and fair consideration to the public's interests in maintaining an open proceeding. This conclusion is required even if the defendant waives his right to a public trial with the consent of the prosecutor.

## FACTS

A high school English teacher, a department head, was charged with criminal sexual conduct in the second degree under MCL 750.520c; MSA 28.788(3). The conduct charged allegedly occurred with a 14-year-old student in the school building during school hours.

Following the preliminary examination, on November 16, 1977, the trial judge, upon stipulation of counsel, issued an order suppressing all pretrial publicity in the case.

Trial was scheduled to begin on February 3, 1978. On that day, just prior to the selection of a jury, a proceeding was held in chambers. Counsel for the teacher made a motion that the trial be closed to the public, giving the following as reasons:

[1] MCL 600.1420; MSA 27A.1420.

"It is the defendant's position that this should be a
closed trial and not a public one because of the possible
impact on the community as a whole in terms of
influencing cases of this kind; the possibility of influenc-
ing youngsters, teenagers in terms of bringing these
kind *[sic]* of charges up against their teachers as a way
of getting back at them. And, if publicized, this trial
would influence youngsters not only towards authority
figures themselves, but especially towards the teaching
profession.

"Also, we are concerned that [the teacher] * * * has
a recognized status in the community and a public trial
would do nothing but ruin that reputation."

The prosecution made no objection to this request.
Without providing an open hearing or stating
reasons, the trial court issued an order excluding
the public from the courtroom.

On February 6, 1978, the Detroit Free Press and
Susan Brown, the reporter assigned by the Free
Press to the trial, filed a complaint for superin-
tending control and a motion for immediate con-
sideration with the Court of Appeals. Before the
Court of Appeals could act, on February 7, 1978,
the trial was concluded, with the jury returning a
verdict of not guilty.

Recognizing that the conclusion of the trial ren-
dered the application for superintending control
moot, the Court of Appeals treated the application
as one for leave to appeal and granted leave. The
Free Press then filed an application with this
Court for leave to appeal from the Court of Ap-
peals prior to decision by that Court. On May 1,
1978, we granted leave to appeal. 402 Mich 926
(1978).

DISCUSSION

At first blush, it appears that this Court's hold-

ing in *Detroit Free Press v Macomb Circuit Judge*, 405 Mich 544; 275 NW2d 482 (1979), would be dispositive of the issue raised in the instant case. In *Macomb Circuit Judge*, which was a case remarkably similar to the case at bar, we opined: "The parties may not, by their mere agreement, empower a judge to exclude the public and press". *Macomb Circuit Judge, supra,* 549. Our decision in that case rested upon § 1420 of the RJA, which reads:

"*The sittings of every court within this state shall be public* except that a court may, for good cause shown, exclude from the courtroom other witnesses in the case when they are not testifying and may, in actions involving scandal or immorality, exclude all minors from the courtroom unless the minor is a party or witness. This section shall not apply to cases involving national security." (Emphasis added.) MCL 600.1420; MSA 27A.1420.

While we think that our narrow, statutorily based holding in *Macomb Circuit Judge* is equally applicable here, respondent maintains that § 1420 is inapposite.

Respondent asserts that the language of the Sixth Amendment of the United States Constitution,[2] "In all criminal prosecutions, the *accused*

[2] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

We note that Article 1, § 20, Michigan Constitution of 1963 contains language similar to that of the Sixth Amendment:

"In every criminal prosecution, the accused shall have the right to a speedy and public trial by an impartial jury, which may consist of less than 12 jurors in all courts not of record; to be informed of the nature of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor;

shall enjoy the right to a speedy and public trial",
and the language of Article 1, § 20, Michigan
Constitution of 1963, "In every criminal prosecu-
tion, the *accused* shall have the right to a speedy
and public trial", vests the right to a public trial
in the accused and the accused alone.[3] Thus, the

to have the assistance of counsel for his defense; to have an appeal as
a matter of right; and in courts of record, when the trial court so
orders, to have such reasonable assistance as may be necessary to
perfect and prosecute an appeal."

[3] During the pendency of this case, the United States Supreme
Court issued its opinion in *Gannett Co, Inc v DePasquale,* 443 US 368;
99 S Ct 2898; 61 L Ed 2d 608 (1979). That case involved whether
members of the press and public have a constitutional right of access
to attend criminal *pretrial hearings.*

Although the lead opinion of Mr. Justice Stewart could be read to
apply to trials as well as pretrial exclusionary proceedings, Chief
Justice Burger's concurring opinion clearly recognized a distinction.
The Chief Justice stated:

"By definition a hearing on a motion before trial to suppress
evidence is not a *trial;* it is a *pre*trial hearing.

*     *     *

"At common law there was a very different presumption for pro-
ceedings which preceded the trial." *Gannett,* 394 (Burger, C.J., con-
curring).

In making his point the Chief Justice quoted an old English case,
*Daubney v Cooper,* 5 Manning & Ryland 314 (KB, 1829), where the
distinction was drawn between trials and pretrial proceedings:

"[Counsel continued] 'Lord *Tenterden* there says, "This being only a
*preliminary* inquiry and not a *trial,* makes, in my mind, *all the
difference.'* "

*     *     *

"Parke, J. [interrupting] 'The decision in *Cox v Coleridge* [1 Barne-
wall & Cresswell 37; 107 Eng Rep 15 (KB, 1822)] turned upon its
being a case of preliminary inquiry.' *Id.,* at 316-318 (emphasis in
original).

"In sum, at common law, the courts recognized that the timing of a
proceeding was likely to be critical." (Footnote omitted.) *Gannett,* 395
(Burger, C.J., concurring).

The issue in the instant case involves the exclusion of the public
from the trial itself.

After this opinion was completed, but before publication, this issue
was addressed by the United States Supreme Court in *Richmond
Newspapers, Inc v Virginia,* 448 US 555; 100 S Ct 2814; 65 L Ed 2d
973 (1980). The United States Supreme Court held that the right of
the public and press to attend criminal trials is guaranteed under the
First and Fourteenth Amendments of the United States Constitution.

right to public trial could be affirmatively waived as can other substantive rights enjoyed by the accused.[4] We disagree.

## I

### *Common-Law Origins of the Right to Public Trial*

Although the exact origin of the tradition of holding trials in public is unknown, it is clear that the tradition has existed for a long time and enjoyed a favored position in the English common-law courts. One of the first commentators to note the fact that trials in England were held publicly was Sir Thomas Smith in his book *De Republica Anglorum,* published in 1583. Smith commented:

"Evidences of writinges be shewed [to the jury], witnesses be sworne, and heard before them not after the fashion of the civill law but openly, that not only the xii, the Judges, the parties and as many as be present may heare what ech witnesse doeth say.

\* \* \*

"All the rest is doone openlie in the presence of the Judges, the Justices, the enquest, the prisoner, and so manie as will or can come so neare as to heare it."[5]

---

[4] It is well recognized that although an accused has the right to a jury trial, such right may be waived. *People v Stoeckl,* 347 Mich 1; 78 NW2d 640 (1956).

However, it has been also recognized that absolute deference need not be accorded an accused's waiver of his right to trial by jury. In *Singer v United States,* 380 US 24; 85 S Ct 783; 13 L Ed 2d 630 (1965), the Court rejected the contention that an accused had an absolute right to waive his jury trial right and to be tried by a judge alone. The Court held that the grant of a bench trial to an accused may be conditioned upon the consent of the judge and prosecutor.

It is also well settled that Sixth Amendment rights may implicate interests beyond those of the accused. In *Barker v Wingo,* 407 US 514; 92 S Ct 2182; 33 L Ed 2d 101 (1972), the Court found that a societal interest in providing a speedy trial existed separately from and potentially in opposition to the interests of the accused.

[5] Smith, Sir Thomas, *De Republica Anglorum* (Alston, ed. Cambridge: University Press, 1906), Book 2, ch 15, p 79; ch 23, p 101.

A later commentator, Sir Matthew Hale, writing in 1670, not only lauded the fact that trials were held publicly but also gave substantive reasons for the desirability of such a practice:

"Ninthly, the excellency of this OPEN course of evidence to the jury, in presence of the judge, jury, parties and counsel, and even of the adverse witnesses, appears in these particulars.

"1st, That it is openly, and not in private before a commissioner or two, and a couple of clerks; where, oftentimes witnesses will deliver that, which they will be ashamed to testify publicly."[6]

It is clear that at the time Smith and Hale were writing, the right to a public trial was one which inhered in the public and was not a right enjoyed by the accused. While the public was encouraged and often required to attend trials,[7] the accused possessed few substantive rights and could hardly be said to benefit from a public trial. One historian noted:

"(1) The prisoner was kept in confinement more or less secret till his trial, and could not prepare for his defence. He was examined, and his examination was taken down.

"(2) He had no notice beforehand of the evidence against him, and was compelled to defend himself as well as he could when the evidence, written or oral, was produced on his trial. He had no counsel either before or at the trial.

\* \* \*

"(5) It does not appear that the prisoner was allowed to call witnesses on his own behalf; but it matters little whether he was or not; as he had no means of ascer-

[6] Hale, *History of the Common Law of England* (Runnington, 6th ed), ch 12, p 345.

[7] Note, *The Right to a Public Trial in Criminal Cases,* 41 NYU L Rev 1138 (1966).

taining what evidence they would give, or of procuring their attendance. In later times they were not examined on oath, if they were called."[8]

Various reasons have been given as to why the English courts developed a system of holding trials in public. Although there is no entirely satisfactory explanation, one of the commonly accepted reasons for this practice was the distrust of secret trials fostered by the abuses of the Spanish Inquisition,[9] the English Court of Star Chamber[10] and the French monarchy's *lettre de cachet.*[11]

The common-law system of open and public trials was hailed by the early English commentators. Both Blackstone and Wigmore viewed the "open forum" as a natural check on possible abuse of judicial power. They also emphasized that public trials could enlighten the public about their government and enhance respect for judicial remedies.[12] But, as Jeremy Bentham declared, the most resounding theme was the important role that

---

[8] 1 Stephen, Sir James Fitzjames, *A History of the Criminal Law of England* (London: MacMillan, 1883), p 350.

[9] Radin, *The Right to a Public Trial,* 6 Temple L Quarterly 381, 389 (1932). The ecclesiastical courts of Great Britain incorporated many of the abuses attributed to the Inquisition. In these courts, the preliminary examination of the accused, the questioning of witnesses, and the trial of the accused were conducted in secret.

[10] There is some conflict among the authorities as to whether the English Star Chamber proceedings were actually held in secret. It is known, however, that accused persons brought before the Star Chamber were often grilled in private and tortured, and were not allowed to assert common-law rules of criminal procedure in their behalf. Washburn, *The Court of Star Chamber,* 12 American L Rev 21, 25-31 (1877); Radin, *The Right to a Public Trial,* 6 Temple L Quarterly 381, 386-388 (1932).

[11] The French *lettre de cachet* consisted of an order by the monarch which allowed the indefinite imprisonment or exile of a particular person without that person being given the opportunity to defend himself. See *In re Oliver,* 333 US 257, 269 fn 23; 68 S Ct 499; 92 L Ed 682 (1948).

[12] 3 Blackstone, *Commentaries,* ch 23; 6 Wigmore, Evidence (Chadbourn rev), § 1834.

publicity could have in insuring fairness and pre-
venting abuse:

"Without publicity, all other checks are insufficient:
in comparison with publicity, all other checks are of
small account. Recordation, appeal, whatever other in-
stitutions might present themselves in the character of
checks, would be found to operate rather as cloaks than
checks—as cloaks in reality, as checks only in appear-
ance."[13]

Publicity, Bentham declared, "is the soul of
justice".[14]

## II

### *The Public Trial Concept: The American Development*

The "open court-open trial" concept developed
early in the American system of jurisprudence.
One of the earliest expressions of the public trial
right is found in the "Frame of Government of
Pennsylvania of 1682", a document signed by Wil-
liam Penn. The document proclaimed the follow-
ing guarantees:

"V. That all courts shall be open, and justice shall
neither be sold, denied nor delayed.
"VI. That, in all courts all persons of all persuasions
may freely appear in their own way, and according to

[13] Bentham, *Rationale of Judicial Evidence,* 6 *The Works of Jeremy
Bentham* (Bowring, ed. Edinburgh: William Tait, 1843), p 355.

[14] Bentham, *Treatise on Judicial Evidence* (1825), p 67.

The foregoing citations relating to the common-law development of
public trials are selected reflections from a number of prominent
scholars. The researcher may find similar analyses from legal writers
compiled both in the majority and dissenting opinions of *Gannett,
supra.*

their own manner, and there personally plead their own cause themselves; or, if unable, by their friends."[15]

The Colonies fully adopted the concept of conducting criminal trials in public. There is no evidence to suggest that Colonial courts recognized that an accused may require that his trial be private.

At the first Congress of the United States, James Madison proposed to the drafters of the Bill of Rights that a provision be included providing for public trials. This proposal was codified in the Sixth Amendment guarantee that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial". Following the Federal model, all states recognize the right to public trial either by constitutional provision, statute or judicial interpretation.[16]

Although the language of the Sixth Amendment public trial guarantee may seem clear and unambiguous, interpretative problems have arisen regarding the dimensions of the right. Courts have

---

[15] 5 Thorpe, *American Charters, Constitutions and Organic Laws, 1492-1908* (Washington, DC: United States Government Printing Office, 1909), p 3060. A further example of the adoption of the public trial concept is found in The Charter or the Fundamental Laws of West New Jersey agreed upon in 1676. A provision of Chapter XXIII reads:

"That in all publick courts of justice for tryals of causes, civil or criminal, *any person or persons, inhabitants of the said Province may freely come into, and attend the said courts, and hear and be present, at all or any such tryals as shall be there had or passed, that justice may not be done in a corner nor in any covert manner,* being intended and resolved, by the help of the Lord, and by these our Concessions and Fundamentals, that all and every person and persons inhabiting the said Province, shall, as far as in us lies, be free from oppression and slavery." 5 Thorpe, p 2551.

[16] Note, *The Right to a Public Trial in Criminal Cases,* 41 NYU L Rev 1138, 1140 (1966). See also Fenner & Koley, *The Rights of the Press and the Closed Court Criminal Proceeding,* 57 Neb L Rev 442 (1978); Note, *Trial Secrecy and the First Amendment Right of Public Access to Judicial Proceedings,* 91 Harv L Rev 1899 (1978).

wrestled with problems such as the extent an accused can invoke the right of public trial; whether the right is one which belongs to the accused alone or is one which the accused shares coextensively with any or all of the public who choose to attend a trial; and what limitations, if any, a court can impose on public attendance at a trial. Resolution of these problems has been difficult and on occasion has produced contrary results.

From a literal standpoint, the Sixth Amendment provides the right to a public trial to "the accused". Based on this provision, the United States Supreme Court decision in *In re Oliver*, 333 US 257; 68 S Ct 499; 92 L Ed 682 (1948), makes clear that the trial and conviction of an accused in secret, even in a contempt proceeding, will be grounds for reversal. The *Oliver* Court recognized that our public trial guarantee "has its roots in our English common law heritage". Citing both the Sixth Amendment and the due process clause of the Fourteenth Amendment, the Supreme Court held:

"In view of this nation's historic distrust of secret proceedings, their inherent dangers to freedom, and the universal requirement of our federal and state governments that criminal trials be public, the Fourteenth Amendment's guarantee that no one shall be deprived of his liberty without due process of law means at least that an accused cannot be thus [in the secrecy of the judge's chambers] sentenced to prison." *Oliver, supra,* 273.[17]

---

[17] The right of an accused to demand a public trial has long been recognized as a fundamental right in Michigan jurisprudence. As early as 1879, the Court, *In the Matter of Way*, 41 Mich 299, 303; 1 NW 1021 (1879), stated without reservation:

"It is a fundamental rule of law and justice that prisoners shall have a fair and public trial, with every protection against oppressive and irregular action."

See also, *People v Micalizzi*, 223 Mich 580; 194 NW 540 (1923);

Amplifying the *Oliver* decision, the United States Court of Appeals in *United States v Kobli,* 172 F2d 919, 923 (CA 3, 1949), declared:

"[T]he Sixth Amendment precludes the general indiscriminate exclusion of the public from the trial of a criminal case in a federal court over the objection of the defendant * * *."

Emphasizing the importance of the constitutional right involved, the *Kobli* court opined that an accused who was denied the right to a public trial need not show any actual prejudice to obtain a reversal of the conviction.[18] The court said:

" '[V]iolation of the constitutional right necessarily implies prejudice, and more than that need not appear. Furthermore, it would be difficult, if not impossible, in such cases for a defendant to point to any definite, personal injury. To require him to do so would impair or destroy the safeguard.' " *Kobli, supra,* 921.

The Sixth Amendment public trial guarantee, however, does not vest absolute rights in the accused. While the accused has the right to demand a public trial to insure fairness and to prevent judicial abuse, the accused possesses no corresponding right to compel a private trial. *Singer v United States,* 380 US 24, 35; 85 S Ct 783; 13 L Ed 2d 630 (1965).

In *Singer,* the Court rejected the argument that since the accused possessed the constitutional right to a jury trial, he had an absolute right to demand

---

*People v Yeager,* 113 Mich 228; 71 NW 491 (1897); *People v Murray,* 89 Mich 276, 284; 50 NW 995 (1891).

[18] *Tanksley v United States,* 145 F2d 58, 59 (CA 9, 1944); *Davis v United States,* 247 F 394, 398-399 (CA 8, 1917); *People v Micalizzi, supra,* 584-585; *People v Yeager, supra,* 230; *People v Murray, supra,* 290.

a bench trial. In that case the Court reviewed the English common-law and Colonial practice. It was concluded that history failed to establish an independent right in the accused to be tried by a judge alone. Thus, the accused was not empowered by the Sixth Amendment to compel the opposite of what he was specifically guaranteed by the Constitution. "The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right. For example, although a defendant can, under some circumstances, waive his constitutional right to a public trial, he has no absolute right to compel a private trial." *Singer, supra,* 34-35.

Similar reasoning was applied by the *Singer* Court involving other Sixth Amendment rights. It was reasoned that although the accused "can waive his right to be tried in the State and district where the crime was committed, he cannot in all cases compel transfer of the case to another district". *Singer, supra,* 35. Also, while he "can waive his right to be confronted by the witnesses against him", he cannot compel the prosecutor "to try the case by stipulation". *Id.*

Furthermore, in a different context, the Sixth Amendment has been held to implicate interests beyond those of the accused. In *Barker v Wingo,* 407 US 514; 92 S Ct 2182; 33 L Ed 2d 101 (1972), with respect to the right to a speedy trial, the Court held:

"In addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separately from, and at times in opposition to, the interests of the accused." *Barker, supra,* 519.

It is thus clear that our English heritage, Colonial American tradition and recent constitutional case interpretations provide no basis on which to predicate a constitutional right in favor of an accused to close a criminal trial by simply waiving his right to a public trial. Furthermore, a careful study of common-law tradition reveals that the public-trial concept developed primarily for the benefit of the public. It is basic to a free and open society that public access to trials be maintained. The societal interests served by this principle are separate from and at times may be in opposition to the interests of the accused. The accused, therefore, cannot waive his right to a public trial in absolute derogation of the public interest.

The interests of society in having access to criminal trials usually are compatible with the interests of an accused. Yet, this by no means diminishes the interest the public has in seeing that justice is administered openly and publicly. A New York Federal District Court in *United States v Lopez*, 328 F Supp 1077, 1087 (ED NY, 1971), poignantly elucidated the important societal interests that are protected by the public-trial guarantee:

"The public has an independent right to be present to see that justice is fairly done. It is important that our citizens be free to observe court proceedings to insure a sense of confidence in the judicial process. Conducting trials behind closed doors might engender an apprehension and distrust of the legal system which would, in the end, destroy its ability to peacefully settle disputes."

Additionally, because a criminal prosecution is brought in the very name of the people, the public has a substantial interest in seeing that its concerns are adequately represented. The Kentucky Court of Appeals has noted:

"It is insisted by some the right to public trial is solely for the benefit of the criminal defendant and if he has no objection to a closed trial then the public should not be permitted to object. This contention overlooks the fact that the public is a party to all criminal proceedings. The proceeding is prosecuted in the name of the public. In our opinion there is nothing that better protects the rights of the public than their presence in proceedings where these rights are on trial." *Johnson v Simpson,* 433 SW2d 644, 646 (Ky, 1968).

Further, since one of the purposes of the public trial guarantee is the protection against perjury, the public has an equally important interest in assuring that criminal prosecutions are decided on truthful and complete records. Certainly, the defendant would prefer an open proceeding to insure that perjured testimony is not brought against him. But the presence of the public also insures that no favoritism is afforded the defendant and protects against perjury by the defendant and his witnesses. It extends assurance that the appearance of justice is maintained. *United States v Cianfrani,* 573 F2d 835, 852-853 (CA 3, 1978).

In addition, the public's concern extends to the actions of its legal officers, the judge and prosecutor. In Michigan these officials are elected, which adds a dimension to the societal interests involved. The performance of essential responsibilities by these officials during criminal trials should be open to public evaluation.

Although an accused has no right to trial closure, in rare specific circumstances, limitations have been placed upon public access to criminal proceedings. Although there is support for the proposition that the court has a duty to provide facilities for a reasonable number of the public, *Estes v Texas,* 381 US 532, 584; 85 S Ct 1628; 14 L Ed 2d 543 (1965) (Warren, C.J., concurring), it is

generally agreed that the size of the courtroom may justifiably limit attendance.[19] Note, *The Right to a Public Trial in Criminal Cases,* 41 NYU L Rev 1138, 1144 (1966). Likewise, in the interest of fairness, a court can exclude from the courtroom members of the public who are creating physical disturbances or causing potentially dangerous situations. *E W Scripps Co v Fulton,* 100 Ohio App 157, 169; 125 NE2d 896 (1955). And, also, in the name of what is termed "public health or morals", courts have allowed exclusion of minors in trials involving sexual matters. *Kobli, supra,* 922.

The limitations imposed are few in number and, for the most part, are required to effectuate the essential dignity and the integrity of the trial process. *Craig v Harney,* 331 US 367, 377; 67 S Ct 1249; 91 L Ed 1546 (1947); *People v Greeson,* 230 Mich 124, 147; 203 NW 141 (1925). In those rare instances where this integrity is compromised by the creation of a "zoo atmosphere", the result may be reversal of a criminal conviction. *Sheppard v Maxwell,* 384 US 333; 86 S Ct 1507; 16 L Ed 2d 600 (1966); *Estes, supra.* In those cases it was determined that the media severely intruded upon court decorum. And on the few occasions where extensive publicity mandated reversal in favor of a defendant, media coverage gave inordinately wide dissemination of critical information at crucial times. *Rideau v Louisiana,* 373 US 723; 83 S Ct 1417; 10 L Ed 2d 663 (1963); *Irvin v Dowd,* 366 US

_____

[19] Commenting on the right of the public to attend a criminal proceeding, Chief Justice Warren in his concurring opinion in *Estes v Texas,* 381 US 532, 584; 85 S Ct 1628; 14 L Ed 2d 543 (1965), declared:

"[A] trial is public, in the constitutional sense, when a courtroom has facilities for a reasonable number of the public to observe the proceedings, which facilities are not so small as to render the openness negligible and not so large as to distract the trial participants from their proper function, when the public is free to use those facilities, and when all those who attend the trial are free to report what they observed at the proceedings."

717; 81 S Ct 1639; 6 L Ed 2d 751 (1961); *Sheppard v Maxwell, supra.*

During this past year the Supreme Court, in a 5-to-4 split opinion, held that the public has no affirmative constitutional right of access to a criminal *pretrial proceeding. Gannett Co, Inc v De-Pasquale,* 443 US 368; 99 S Ct 2898; 61 L Ed 2d 608 (1979). The Court reasoned that publicity concerning pretrial suppression hearings poses special risks of unfairness because potential jurors may be informed of inculpatory information inadmissible at trial.[20] In the instant case, however, we are dealing with closure of the trial itself.

### III

Our tracing of the historical development of the public trial concept causes us to reject the contention of respondent in this case. While in its inception at common law the public trial right was established for the benefit of the public alone, it later developed to include protections for the accused. These protections or benefits conferred by the Sixth Amendment and Article 1, § 20, of the Michigan Constitution include freedom from judi-

---

[20] Although limiting the opinion to the issue presented regarding a *pretrial proceeding,* the lead opinion of Justice Stewart couched its reasoning in terms of a trial. Stewart opined that members of the public do not have an enforceable right to a public trial that can be asserted independently of the parties in litigation.

However, the concurrence of Chief Justice Burger specifically limited its analysis to relate to pretrial proceedings. Also, Justice Powell's concurring opinion explicitly stated that a news reporter "had an interest protected by the First and Fourteenth Amendments in being present at the pretrial suppression hearing". *Gannett,* 397 (Powell, J., concurring).

Significantly, the lead opinion found the actions of the trial judge "were consistent with any right of access the petitioner may have had under the First and Fourteenth Amendments". *Gannett,* 392-393 (Stewart, J.). The Court recognized with approval that the trial judge in open court, after the filing of briefs, balanced the rights of the press and the public against the defendant's right to a fair trial.

cial or prosecutorial oppression, freedom from perjured testimony, and an assurance of basic fairness because transactions occur openly and publicly.

But in providing these protections to the accused, there was no intent to denigrate the interests of the public which are at the root of the public-trial guarantee. The very public itself has a substantial interest in assuring that justice is openly and fairly meted out in its name. The public must also be confident that its judicial representatives do not abuse the power which the public confers upon them.

While it is obvious that there are practical limitations on the ability of large numbers of the public to attend a trial, this should by no means inhibit the public's interest in being informed. In this regard, the public must depend upon a vigorous press to keep it advised, as Justice White has noted:

"In the first place, in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring him in convenient form the facts of those operations. * * * With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice." *Cox Broadcasting Corp v Cohn,* 420 US 469, 491-492; 95 S Ct 1029; 43 L Ed 2d 328 (1975).

Thus, the press, as a segment of the public, acts to assist the whole public in guaranteeing the openness and integrity of the trial process.

The trial participants, including the judge, may not necessarily appreciate or fully recognize the fundamental societal interests. Upon occasion the tactics of a defendant and prosecutor may coincide

to demand closure. Perhaps due to indifference or mere timidity one party may accede by stipulation to a request by the other to hold a secret trial. Who, then, may truly stand to protect the people's interest to know? We are convinced that this principle, deeply rooted in the common law, may be asserted by members of the public when deemed necessary.

We have concluded that an accused has no right to exclude the public·from a trial by affirmative waiver. However, we further recognize, under extraordinary circumstances to preserve the due process right of a fair trial, an accused may request that the public's access to a trial be limited or temporarily denied. Upon such rare occasion, the court must exercise its discretion in balancing competing interests. The judge must always carefully balance the fundamental common-law principle of open trials with the specific unusual circumstance that allegedly endangers a fair trial.

An accused who seeks closure has the heavy burden to show by a substantial probability that prejudicial error denying the accused a fair trial will result from proceeding in public. In addition, it must be shown by a substantial probability that closure will be effective in dealing with the danger and no alternatives to closure exist that would protect the fair trial right.

The accused here would, in effect, limit the public's ability to attend and participate in the trial process. Not only would this limitation befall the public in general but also the press in particular. We find such limitation untenable. We are not unaware that one wrongfully accused can suffer acute embarrassment and damage to reputation through the trial process.[21] However, because it is not only the accused who has interests in the trial

---

[21] In *United States v American Radiator & Standard Sanitary Corp,*

process, any limitation on the public's right to attend a trial must adhere to a standard that there is a substantial probability that prejudicial error denying the accused a fair trial will result.[22]

274 F Supp 790 (WD Pa, 1967), defendants asserted that damage to their business reputation would result from any publicity concerning anti-trust charges pending against them. Damage to business reputation was rejected as an insufficient ground to support defendants' request that the public and press be excluded from pretrial hearings.

[22] Compare *Gannett,* 440 (Blackmun, J., dissenting):

"[A]n accused who seeks closure [is required] to establish that it is strictly and inescapably necessary in order to protect the fair trial guarantee."

See also *American Radiator, supra,* where the defendants' request to exclude the public from pretrial hearings was denied. Defendants made an insufficient demonstration that publicity would prejudice obtaining an impartial jury at trial.

In *Phoenix Newspapers, Inc v Jennings,* 107 Ariz 557, 560; 490 P2d 563 (1971), an order excluding the public and press from a pretrial hearing, upon defendant's request, was held to be erroneous. The standard for ordering exclusion of the public was stated as follows:

"If circumstances exist which establish a *clear and present danger that the judicial process will be subverted by an open hearing, appropriate action should be taken by a court* to preserve judicial integrity. * * * Clear and present danger means that the substantive evil must be extremely serious and the degree of imminence extremely high." (Citations omitted.) (Emphasis added.)

In *State v White,* 97 Ariz 196, 198; 398 P2d 903 (1965), the court held that the trial judge acted properly in partially complying with defendant's motion to exclude all spectators from the trial, stating:

"[H]ere defendant is claiming he has a right to a secret trial. We find no merit in such an argument. The community is deeply interested in the right to observe the administration of justice and we feel the presence of its members at a public trial is as basic as that of a defendant. This in no way, however, deprives the trial court, in its sound discretion, to make *reasonable exclusion orders consistent with the rights of the accused in a proper case* in the interest of public morals or safety." (Emphasis added.)

The Court in *Commercial Printing Co v Lee,* 262 Ark 87, 95; 553 SW2d 270 (1977), held that the trial court erred by excluding the public during voir dire of the jury, pursuant to defendant's request:

"[I]t would require *unusual circumstances for this right [public's right to attend a criminal trial] to be held subordinate to the contention of a defendant that he is* prejudiced by a public trial (or any part thereof)." (Emphasis added.)

In *State v Marshall,* 166 Conn 593, 598; 353 A2d 756 (1974), the trial court's refusal of defendant's request to exclude a news reporter from a portion of the trial was held proper. The court explained:

"Nor do we believe that the defendant had an absolute right to

Furthermore, in Michigan, this common-law principle of public access to trials has been codified by legislative pronouncement. It is the policy of this state, with certain specific exceptions, that "[t]he sittings of every court within this state shall be public".[23] This clear legislative declaration is

exclude the newspaper reporter from the trial. As the United States Supreme Court observed in *Craig v Harney,* 331 US 367, 374; 67 S Ct 1249; 91 L Ed 1546 [1947]: 'A trial is a public event. What transpires in the court room is public property. * * * There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it.' "

In *State ex rel Gore Newspapers Co v Tyson,* 313 So 2d 777, 782 (Fla Dist Ct App, 1975), the exclusion of the public and press from civil proceedings, pursuant to the request of both parties, was held to have been improper. The Court opined:

"The inherent power of the court to control the conduct of its own proceedings is not limited to criminal proceedings although most of the pronouncements regarding the exercise of this power have been made in criminal cases. A civil litigant is no less entitled to a fair and an impartial trial than a defendant in a criminal case; *and where necessary, the court in furtherance of the litigants' right to a fair trial may exclude the public and press in circumstances not unlike those found in criminal proceedings—but then only for the most cogent reasons."* (Emphasis changed.)

Finally, in *Gannett Pacific Corp v Richardson,* 59 Hawaii 224, 233; 580 P2d 49 (1978), the court set forth the following test for evaluating a defendant's request to exclude the public from the preliminary examination:

"We think, therefore, while reaffirming this jurisdiction's policy of openness in judicial proceedings, that traditional notions of fair play and impartial justice require that where the presiding judge, upon motion of the defendant for closure, determines that certain evidence sought to be introduced may be inadmissible at trial on the issue of guilt or innocence, but is admissible at a preliminary hearing on the question of probable cause, and further finds that there is a *substantial likelihood that an open hearing as to that part of the proceedings would interfere with the defendant's right to a fair trial by an impartial jury,* a departure from this policy will be justified." (Emphasis added.)

[23] In *People v Murray, supra,* this Court noted that the predecessor to MCL 600.1420; MSA 27A.1420, had been in force since 1846. In rejecting a claim that under the statute certain members of the public could be excluded from the trial over defendant's objection, the Court stated:

"Who is to decide who are the friends of the accused? *The law makes no such test, but allows all citizens freely to attend upon any trial,* whether civil or criminal. Instances have been referred to by

fully compatible with the constitutional rights expressed in the Sixth Amendment and Article 1, § 20 of the Michigan Constitution. It also may be accommodated with due process rights requiring a fair trial.

In this case, the accused made no showing of substantial probability that prejudicial error denying the accused a fair trial would result if the trial were to proceed in public. There was no full and fair consideration given to the public's interests in maintaining an open proceeding by the court prior to ordering the trial closed. Therefore, the order entered by the trial court excluding the public from attending the trial is reversed. No costs, a public question.

KAVANAGH, WILLIAMS, and FITZGERALD, JJ., concurred with BLAIR MOODY, JR., J.

LEVIN, J. *(concurring in reversal)*. Justice MOODY's extensive research amply supports his conclusion that there is a common-law presumption in favor of public trials which is not affected by a defendant's waiver of his Sixth Amendment right to a public trial. We would, however, rest disposition on other grounds.

In *Detroit Free Press v Macomb Circuit Judge*[1] this Court held that § 1420 of the Revised Judicature Act[2] entitles the public to attend the sittings

Judge Cooley in his work upon Constitutional Limitations, 5th ed, at page 380 (star page 312), where, under certain circumstances, it might be proper to exclude a certain portion of the community from attending trials which would tend to degrade public morals, or would shock public decency, in which he says that at least the young should be excluded. There can be no objection to this, so long as citizens of the State who have arrived at the years of discretion and manhood are permitted to enter freely." (Emphasis added.) *Murray, supra,* 291.

[1] *Detroit Free Press v Macomb Circuit Judge,* 405 Mich 544; 275 NW2d 482 (1979).

[2] MCL 600.1420; MSA 27A.1420.

of every court, so that "mere agreement of parties to a suit is insufficient" to warrant closure.[3] The only question presented in the instant case not addressed in or disposed of by *Macomb Circuit Judge* is whether a corollary to the defendant's Sixth-Amendment right to a public trial is an implied constitutional right to a private criminal trial.[4]

It appears from the United States Supreme Court's decision in *Richmond Newspapers, Inc v Virginia,*[5] holding that the public has a First-Amendment right to attend criminal trials,[6] that the issue not addressed in *Macomb Circuit Judge* has been decided. Opinions for four justices,[7] citing *Gannett Co, Inc v DePasquale,*[8] state that the Sixth Amendment does not give a defendant an implied right to a private trial; the opinions for three other justices necessarily imply as much, but without explicit reliance on *Gannett.*[9]

The instant case thus is controlled by RJA, § 1420, *Macomb Circuit Judge,* and by the absence of a Sixth-Amendment right to a private trial. In

[3] *Detroit Free Press v Macomb Circuit Judge, supra,* p 547.

[4] The facts of the instant case are similar to those in *Macomb Circuit Judge,* and, as in that case, closure was ordered in this case on the basis of "mere agreement of [the] parties", without recognition of the public's right to attend trials.

[5] *Richmond Newspapers, Inc v Virginia,* 448 US 555; 100 S Ct 2814; 65 L Ed 2d 973 (1980).

[6] Although there was no opinion of the Court, seven of the eight participating Justices agreed that the First Amendment protects the public's right of access to criminal trials.

[7] *Richmond Newspapers, Inc v Virginia, supra,* p 580 (opinion of Burger, C.J.); p 598, fn 1 (opinion of Stewart, J.).

[8] *Gannett Co, Inc v DePasquale,* 443 US 368; 99 S Ct 2898; 61 L Ed 2d 608 (1979).

[9] *Richmond Newspapers, Inc v Virginia, supra,* p 597 (opinion of Brennan, J., to the effect that "public access is an indispensable element of the trial process itself" such that closure may not be ordered merely on the basis of the defendant's request, even if agreed to by the prosecutor), and p 603 (opinion of Blackmun, J., to the effect that the Sixth Amendment itself gives the public a right of access).

light of the *Richmond Newspapers* decision, however, we should also recognize the First Amendment in the disposition of this case.[10]

The public's First-Amendment right to attend criminal trials is not absolute.[11] It is sufficiently strong, however, that it has been said that closure may be ordered only after the trial judge has made a finding that "closure is required to protect the defendant's superior right to a fair trial, or that some other overriding consideration requires closure".[12] Such a finding must, of course, rest on substantial evidence, developed at an evidentiary hearing.

No such finding was made in this case; the order of closure was therefore improper.

Although we agreed to decide this case in order to give guidance for future cases,[13] we should not attempt in this case to define the circumstances in which a defendant's right to a fair trial will be violated unless closure is ordered, beyond noting that a finding that closure is necessary to protect the defendant's right implies that alternatives to closure have been explored and found inadequate.[14]

---

[10] The trial which led to this appeal has been completed, so, as applied to these precise facts, the issue is moot. We address the question because it is one which might otherwise evade review. The purpose of our review thus is to provide guidance for the future. Although the First-Amendment issue may not have been fully presented to this Court, the *Richmond Newspapers* holding will be binding in all future cases in which closure requests are made, and should therefore be recognized.

[11] *Richmond Newspapers, Inc v Virginia, supra,* p 581, fn 18 (opinion of Burger, C.J.); p 598 (opinion of Brennan, J.); p 600 (opinion of Stewart, J.); *Detroit Free Press v Macomb Circuit Judge, supra,* pp 546-547.

[12] *Richmond Newspapers, Inc v Virginia, supra,* pp 564, 581: "Absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." (opinion of Burger, C.J.).

[13] See fn 10, *supra.*

[14] Applying his analysis to the *Richmond Newspapers* facts, Chief Justice Burger said:

"Despite the fact that this was the fourth trial of the accused, the

Nor would it be proper to attempt to catalogue the "other overriding considerations" not based on the right to a fair trial which would justify restriction of the public's constitutional right to attend. The determination whether particular findings adequately support a closure order should be made in the context of a case in which, after an evidentiary hearing, findings thought by the trial judge to be sufficient and adequately supported by the record have been made.[15]

I agree that the trial court erred and concur in reversal. No costs, a public question.

COLEMAN, C.J., concurred with LEVIN, J.

RYAN, J. *(dissenting)*. On July 2, 1980, while this case was under consideration, the United States Supreme Court decided *Richmond Newspapers, Inc v Virginia,* 448 US 555; 100 S Ct 2814; 65 L Ed 2d 973 (1980).

---

trial judge made no findings to support closure; no inquiry was made as to whether alternative solutions would have met the need to ensure fairness; * * * there exist in the context of the trial itself various tested alternatives to satisfy the constitutional demands of fairness. * * * There was no suggestion that any problems with witnesses could not have been dealt with by their exclusion from the courtroom or their sequestration during the trial. * * * Nor is there anything to indicate that sequestration of the jurors would not have guarded against their being subjected to any improper information. All of the alternatives admittedly present difficulties for trial courts, but none of the factors relied on here was beyond the realm of the manageable. Absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." *Id.,* pp 580-581. See, also, *id., p* 600 (opinion of Stewart, J.).

[15] In *Richmond Newspapers,* as in the instant case, the trial judge made no finding that an overriding interest justified closure, and this made it unnecessary to decide what findings would present a sufficient cause for closure. "We have no occasion here to define the circumstances in which all or parts of a criminal trial may be closed to the public", *id., p* 581, fn 18 (opinion of Burger, C.J.); "[w]hat countervailing interests might be sufficiently compelling to reverse this presumption of openness need not concern us now, for the statute at stake here authorizes trial closures at the unfettered discretion of the judge and parties", *id., p* 598 (opinion of Brennan, J.).

Although six concurring opinions were written in the case, and four of the seven Justices voting in the majority concurred only "in the judgment", it is clear that all seven agreed that the First Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, guarantees to the public, including the press, the right to attend criminal trials.

As Chief Justice Burger, writing the lead opinion, said:

"We hold that the right to attend criminal trials is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of the freedom of speech and 'of the press could be eviscerated' ",

and,

"Absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." Opinion of Burger, C.J. (Footnotes and citations omitted.)

We have intentionally delayed the release of our decision in this case for months, awaiting the decision in *Richmond Newspapers, supra,* suspecting the decision in that case would control resolution of the issue before us. Just as suspected, *Richmond Newspapers* is squarely on point and, in my view, is dispositive of this case.

The majority of this Court, however, while acknowledging *Richmond Newspapers,* has held merely that:

"On the basis of common law and § 1420 of the

Revised Judicature Act, we conclude that the public may not be excluded from a criminal trial without first giving full and fair consideration to the public's interests in maintaining an open proceeding." (Footnote omitted.)

Therefore, notwithstanding that the factual similarities of *Richmond Newspapers* and this case render the two cases jurisprudentially indistinguishable, the majority holds that the public has a mere *interest* in access to criminal trials based upon the common law and the statute, and declines to recognize a *constitutional right* of access under the First and Fourteenth Amendments of the United States Constitution.

Although declaring that the "result in this case is consistent with the result reached in *Richmond* and could now be predicated upon the holding in *Richmond*", the majority prefers "an alternate ground for decision" and thus declines to hold that the Detroit Free Press and its representatives, and indeed the entire public, have the same constitutional rights as do the Richmond Newspaper and its representatives.

While no reason is stated for that preference, my colleagues' opinion suggests, but certainly does not state, that the disinclination to recognize the plaintiff's constitutional right to attend criminal trials is because the parties before us only "perfunctorily raised First-Amendment arguments".

While it is true that the appellant's claim that the public has a constitutional right to attend criminal trials was based upon the Sixth Amendment to the United States Constitution, nevertheless the appellants stated four separate times in their brief that the public's right to be present at such trials was also guaranteed, "arguably, by the

First Amendment".[1] In addition, the appellee Recorder's Court Judge, in his answering brief, four times acknowledged that the appellant was relying on an "arguable" First Amendment claim and indeed explicitly asserted that "neither the First nor the Sixth Amendments to the Federal Constitution gives the public or the press a right to be present at the trial of a criminal defendant".[2]

Thus, while the parties were principally concerned with an asserted Sixth Amendment constitutional right to attend criminal trials, the appellant raised an "arguable" First Amendment claim, if only as a secondary argument, and the appellee specifically replied to it. In any event, the resolution of this case is governed by the First Amendment of the United States Constitution as it is made applicable to the states through the Fourteenth Amendment. The United States Supreme Court has said as much in *Richmond Newspapers.*

The parties before us have been waiting a year and a half for our decision. We purposely delayed its release, awaiting United States Supreme Court guidance on the question in the *Richmond Newspapers* case. We have that guidance now and we should follow it. Surely we cannot have laid aside this case for months awaiting *Richmond Newspapers* merely in order to acknowledge its release, declare we could have predicated today's *result* upon it, and otherwise ignore its precedent-shattering holding. In my view, the route taken by my colleagues assures the irrelevance of today's decision and fuels the increasingly widespread notion that state courts cannot be depended upon to adequately address and resolve cases involving major Federal constitutional issues.

---

[1] Appellant's brief, pp 10, 16, 25 and 27.

[2] Appellee's brief, p 16. See also pp 7, 12 and 15.

If it is thought that there is any conceivable basis upon which this case can be distinguished from *Richmond Newspapers,* or that the rule of that case should not be applied until the parties before us have further addressed the issues, an order might enter requiring them to file typewritten supplemental briefs within 30 days addressing the applicability of *Richmond Newspapers.*

In my view, however, even that is not necessary. I would hold that under the First Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, the public, including representatives of the press, have a constitutional right to attend criminal trials.